No. 87,820

THOMAS R. WINSTON, M.D., *Appellant*, v. STATE DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES, *Appellee*.

(49 P.3d 1274)

Opinion filed July 19, 2002.

*Allan E. Coon*, Norton, Hubbard, Ruzicka & Kreamer L.C., of Olathe, argued the cause and was on the brief for appellant.

*Paula B. Hurt*, Kansas Department of Social and Rehabilitation Services, of Overland Park, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Appellant Thomas R. Winston, M.D., appeals the district court's order affirming the final administrative order of the Kansas Department of Social and Rehabilitation Services' (SRS) State Appeals Committee which affirmed the SRS presiding officer's order finding that appellant physically abused his son and emotionally abused his son and daughter. Appellant claims (1) SRS failed to follow prescribed procedures; (2) the procedures employed by SRS created an unconstitutional condition upon his due process right to be heard; (3) he was deprived of due process; (4) the doctrine of res judicata barred subsequent proceedings; (5) the testimony of unsubstantiated allegations was improperly admitted into evidence; (6) the findings of physical and emotional abuse were not supported by substantial evidence; and, (7) the presiding officer's rulings were arbitrary and capricious.

Thomas Winston's twin children, D.W. and M.W., were born May 19, 1989. Winston is a cardiothoracic surgeon. Winston and his wife Julia separated in March 1998. When Julia filed for divorce, she alleged incompatibility and requested that she be given custody subject to reasonable visitation rights. The divorce was finalized in August 1999.

In August 1998, SRS received a confidential report alleging that Winston had physically abused D.W. SRS, along with the Overland Park Police Department, began an investigation of the allegation. The specific incident being investigated occurred the weekend of August 23, 1998, while the children were visiting their father at his apartment. D.W. reported that while trying to remove a paper containing his mother's phone number from Winston's hand, Winston picked him up by the neck and pushed his face into the corner. D.W. stated that he had a hard time breathing. Winston also hit D.W. several times with his hand and a tennis shoe. M.W. was present at the time. After this incident, Julia obtained a restraining order against Winston. Winston violated the order by continuing to contact Julia by telephone.

M.W. told Detective Barbara Hohnholt and SRS social worker Sarah Byall on August 26, 1998, that her father hits both her and D.W., but that he mainly hits D.W. hard. M.W. has also observed her father sit on D.W., strangle him, and put a pillow on his face.

Separately, M.W. and Julia described the events of this most recent incident of alleged abuse the same as D.W. Julia also reported that Winston had frequently beaten her and had started physically abusing the children when they were in kindergarten. She stated that Winston, in an apparent attempt to intimidate her and the children, had purchased a 2-foot African flesh-eating fish, then threatened to cut up Julia and the children and feed them to the fish. Winston had also said things to D.W. like, "I'm going to make you disappear by cutting you up into a thousand pieces," "you're no good," "your mom and I don't love you."

Julia had previously reported to police that on or about March 4, 1998, Winston had told the children that she would disappear one night and that when they woke up, she would be gone. About a week later, Winston told the children he wished Julia would drop dead. Winston has also threatened to kill Julia in front of the children. These comments obviously upset the children. Julia reported to Detective Hohnholt and Sarah Byall that on March 15, 1998, Winston was so frustrated that he threw D.W. across the room and caused D.W. to hit his head. Julia ordered Winston to leave the house and filed for divorce the next day.

On or about September 29, 1998, SRS notified Winston that he had been substantiated for abuse of D.W. See K.A.R. 30-46-10(d) and (e). Winston requested a fair hearing on October 9, 1998. One month later, SRS notified Winston that it had also validated him for abuse of D.W. The validation was for physical and emotional abuse. See K.A.R. 30-46-10(f). Winston was validated so his name could be placed in the Kansas Child Abuse and Neglect Central Registry. The Kansas Child Abuse and Neglect Central Registry is a confidential listing of individuals who are not permitted to be employed, reside, or volunteer in Kansas child care facilities. It must be noted that, at this same time, Winston was involved in a possible criminal action arising from the alleged acts, as well as a civil divorce action.

During 5 months of not seeing his children, Winston met with the SRS case manager, and he and the children separately attended therapy. A supervised visit was finally arranged for the evening of January 12, 1999, at the Johnson County Courthouse. In addition

to Winston, D.W., and M.W., Dr. Jeff Montolio, a psychologist, Roxie O'Brien, a CASA volunteer, and Greg Rainbolt, a deputy with the Johnson County Sheriff's Department, were also present. Dr. Montolio and Deputy Rainbolt were present because D.W. was afraid of Winston and had only agreed to enter the visitation room if they were present to protect him. When D.W. entered the room, he did not greet his father. D.W. sat on the opposite end of the table, diagonally, from Winston. D.W. later told Sarah Byall that " 'the police had to be there so he would not hurt us,' " that he is " 'very afraid' " of his father, and that his father " 'violates [the] restraining order.' " D.W. also stated that Winston drives by their house, which makes him feel unsafe.

When M.W. entered the visitation room, she was hesitant, tense, and a bit apprehensive. Winston hugged M.W. and placed her on his leg, with her legs dangling between his. Winston continued to hug M.W. while she was on his lap. Her thigh was right next to Winston's crotch. Julia stated that M.W. freaked out while they were driving home after the visit. M.W. was frantic and crying and told Julia that it was " 'hard and sticking up' " and that " 'he was pushing [her] up against it.' " After arriving home, M.W. went to the bathroom, took off her clothes, and asked Julia to wash the clothes. She then took a bath, went to bed, and pulled the blankets over her head. M.W. cried, curled up in a ball, did not sleep, and refused to eat or drink that night. The next morning, M.W. did not want to go to school. When Julia drove her to school, M.W. refused to go inside.

School counselor Janice Mueller finally convinced M.W. to come inside the school. M.W. was visibly upset. M.W. drew a picture of herself sitting on Winston's lap. She drew his erection and his weird smile. According to Mueller, the penis was a focal point for M.W. because she kept drawing it over and over again with the marker. M.W. told Mueller that whenever she or D.W. see this particular smile on their father, they know that he will hurt them in some way or that something bad is going to happen. M.W. also told Mueller that she was upset being on her father's lap. She felt something was happening, did not like it, and wanted to get off his lap.

On January 14, 1999, SRS received a confidential report alleging Winston had sexually abused M.W. during the supervised visitation. On January 15, 1999, M.W. was interviewed by Jorie Siegwald at Sunflower House. During the interview, M.W. disclosed that while she was sitting on her father's lap at the visitation 3 days earlier, "his thing-a-ma-bobber grew," that his "weiner" grew and that she felt his weiner on her leg. M.W. said that her father kept pulling her closer to him and would not let her go. M.W. stated that she left her father's lap after Dr. Montolio asked her if she would be more comfortable in a chair. During the interview, M.W. drew a picture of herself sitting on Winston's lap. The drawing appears to depict an erect penis. M.W. also reported that her father had hit her and her brother and had left hand prints and bruises on them. M.W. stated that once her father threw a sack of dog food at her mother and that on other occasions Winston had hit her mother. M.W. has also written about the abuse in her journal at school.

On March 29, 1999, Detective Ed McGillivray interviewed Winston regarding the incident with M.W. Winston denied having an erection during the visit and suggested that his daughter may have mistook his wallet and car keys, which he keeps in his front pocket, for his penis. Winston suggested that M.W. made these statements because she was being coached by Julia.

On April 2, 1999, SRS notified Winston that it had substantiated and validated him for the abuse of M.W. On April 25, 1999, it was determined that there was insufficient evidence to establish a criminal charge against Winston for the alleged sexual abuse of M.W.

On May 18, 1999, SRS notified Stephen E. Good, the presiding officer assigned to the appeal in the D.W. case, that it was withdrawing its finding of validation on the child abuse of D.W. and was preparing an amended finding of unsubstantiated abuse. Presiding Officer Good notified Winston of the withdrawal of the finding and informed him that his appeal would be dismissed as moot. On May 28, 1999, Winston withdrew his appeal.

On May 20, 1999, Winston filed an untimely request for a fair hearing on the allegations relating to M.W. SRS opposed the fair hearing because it was untimely requested. The presiding officer

in that case was also Stephen E. Good. Good denied SRS's motion to dismiss the appeal.

On or about August 3, 1999, SRS sent a notice of substantiation and validation to Winston regarding the physical and emotional abuse of D.W. and an amended notice of substantiation and validation regarding the sexual and emotional abuse of M.W. Winston appealed, requesting a fair hearing in both cases. The appeals were consolidated.

Winston then filed a motion to dismiss the findings regarding D.W., claiming that refiling of these charges was arbitrary and capricious. The motion was denied. An administrative hearing was conducted on February 15, 16, and 18, 2000. At the hearing, evidence was presented that D.W. and M.W. attended a weekly divorce support group in fourth grade facilitated by Janice Mueller. D.W. shared with the group that his dad hit him and threatened to kill him and the rest of his family. Mueller observed that D.W. had fear in his face when he said this. According to Mueller, D.W.'s comments were spontaneous and did not appear to be coached. Mueller observed that since Winston moved out of the home, the children have "come out of their shells."

Sharon Cohen, a friend of Winston and Julia, testified that in September 1996, she received a frantic telephone call from Julia that Winston was choking and throwing D.W. against the wall. Cohen spoke with Winston. Winston complained about what D.W. had done. Cohen testified that she reminded Winston that D.W. was a child and that he was an adult, then told him he was out of control, and suggested that he needed to leave the house and obtain counseling.

Winston testified that he had told Cohen that D.W. had hit his head on the card table while the two of them had been wrestling for fun. He denied ever telling Cohen that he had hit D.W. or that he (Winston) was out of control. He testified that Cohen lied because she was a good friend of Julia and Julia's lawyer, and because after his separation from Julia he had cancelled an insurance policy he had purchased from Cohen's husband.

Winston testified that the March 1998 incident, which led to his separation from Julia, occurred differently than Julia reported.

D.W. has attention deficient hyperactivity disorder (ADHD) and oppositional behavior. On that day, D.W.'s medication had worn off. D.W. refused to allow Winston to enter the kitchen of the home and was very distraught over the result of a basketball game. Winston had been paged by the hospital. After spending 20 minutes trying to calm down D.W., Winston stepped over D.W., who had been blocking the doorway by sitting in it, and went to the phone. Winston testified that D.W. began pushing Winston and at some point D.W. fell when his feet slid from underneath him on the wooden floor. D.W. then ran to Julia, who accused Winston of throwing D.W. against the wall and ordered Winston to leave.

Winston denied abusing D.W. during the visitation at his apartment. Winston testified that when he picked up the children, he noticed that D.W. was "coming off" his medication. Winston testified that Julia did not regularly administer D.W's medication. At the apartment, D.W. became upset that M.W. had given Winston Julia's cell phone number. D.W. took the piece of paper on which the number was written and played "keep-away" for 15 minutes. Winston needed to contact Julia so that he could drop the children off and answer his page to go the hospital. Winston finally recovered the piece of paper, and while dialing the number, D.W. jumped on his back and fell to the floor. Winston testified he knelt down, put his hand on D.W.'s chest, and told D.W. to settle down. Winston stated he then took the children back to Julia's. Julia did not mention this alleged incident at a court hearing for maintenance on the following Monday. Julia's request for maintenance was denied. Neither Sarah Byall nor Detective Hohnholt observed bruises on D.W. as a result of this incident.

As for the allegation relating to the supervised visitation, Winston continued to deny it. Winston admitted that M.W. sat on his lap during the visitation, but denied that he was sexually stimulated or had an erection. None of the individuals in the room at the time of the visitation saw Winston exhibit any inappropriate behavior toward M.W.

In his March 8, 2000, initial order, Presiding Officer Good affirmed SRS's substantiation and validation of Winston regarding

the physical abuse of D.W. and the emotional abuse of D.W. and M.W. Good reversed the substantiation and validation of Winston for the sexual abuse of M.W. Winston appealed and SRS cross-appealed the presiding officer's findings to the State Appeals Committee. See K.A.R. 30-7-78.

In a final order issued September 21, 2000, the State Appeals Committee restated the findings of fact as stated in the initial order and adopted the presiding officer's conclusions of law.

Winston filed a petition for review in Johnson County District Court on October 12, 2000. The district court upheld the findings of the presiding officer and the State Appeals Committee. Winston filed a timely notice of appeal. This court has jurisdiction over this case by transfer on its own motion pursuant to K.S.A. 20-3018(c).

## DEFICIENCIES IN SRS PROCEDURES

Winston contends there were statutory and constitutional deficiencies in the procedures used by SRS in substantiating and validating him for emotional and physical abuse of D.W. Winston alleges: (1) SRS failed to follow prescribed procedures; (2) the procedures employed by SRS created an unconstitutional condition upon Winston's due process right to be heard; (3) Winston was deprived of due process because SRS failed to follow its internal procedures and because SRS made its initial findings of abuse against D.W. before Winston was given notice that civil proceedings had been instituted against him or given an opportunity to be heard; (4) the doctrine of res judicata bars the subsequent proceedings against D.W.; and (5) the testimony of unsubstantiated allegations was improperly admitted into evidence.

This appeal is pursuant to the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.*, which allows the district court to grant relief *only* if it determines any one or more of the following:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

The party asserting the agency's action is invalid bears the burden of proving the invalidity. K.S.A. 77-621(a)(1).

An appellate court, in reviewing an agency action, is limited to ascertaining from the record whether there is substantial competent evidence to support the agency findings. *Sokol v. Kansas Dept. of SRS*, 267 Kan. 740, Syl. ¶ 3, 981 P.2d 1172 (1999). "Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issue can reasonably be resolved." *Kansas Dept. of SRS v. Paillet*, 270 Kan. 646, Syl. ¶ 2, 16 P.3d 962 (2001). This court reviews an appeal from an agency's action under the KJRA as though the appeal had been made directly to this court and is subject to the same limitations of review as the district court. *Sokol*, 267 Kan. at 746; *U.S.D. No. 443 v. Kansas State Board of Education*, 266 Kan. 75, 81, 966 P.2d 68 (1998). If the issue is a question of law, this court has unlimited review. *Murphy v. Nelson*, 260 Kan. 589, 594, 921 P.2d 1225 (1996).

## Failure to Follow Prescribed Procedures

Pursuant to K.S.A. 77-621(c)(5), an agency's failure to follow prescribed procedures is a ground for granting relief under the KJRA. Winston contends SRS failed to follow a prescribed procedure in not providing Winston with an opportunity to be interviewed prior to being substantiated and validated for abuse of D.W. K.A.R. 30-46-13(a) provides that "[e]ach alleged perpetrator shall have an opportunity to be interviewed before a finding is issued validating a perpetrator."

Appellate courts shall give deference to an agency's interpretation of its own regulation. *Reed v. Kansas Racing Com'n*, 253 Kan. 602, 610, 860 P.2d 684 (1993). "An agency's interpretation of its own regulation will not be disturbed unless the interpretation is clearly erroneous or inconsistent with the regulation." *Murphy*, 260 Kan. at 595. The appellate court will not, however, abdicate its responsibility of judicial oversight in reviewing agency actions as a result of this deference. *Bruns v. Kansas State Bd. of Technical Professions*, 255 Kan. 728, 729, 877 P.2d 391 (1994).

After the confidential report of abuse to D.W. was received by SRS, SRS jointly investigated the allegation with the Overland Park Police Department. Both Detective Hohnholt and Sarah Byall interviewed D.W., M.W., and Julia. Detective Hohnholt attempted to contact Winston by phone and was unable to reach him. Winston did, however, return Detective Hohnholt's calls. After Detective Hohnholt left a message that she was trying to contact Winston about the allegation of abuse, Winston's attorney, Jim O'Hara, called Detective Hohnholt. A meeting was set up for September 2, 1998, but Winston was unable to keep the appointment. O'Hara then referred Detective Hohnholt to Tom Erker. Erker advised Detective Hohnholt that he was not currently representing Winston but that he probably would be soon. Erker later contacted Detective Hohnholt indicating that he was representing Winston and that he would like to set up an appointment; however, Erker did not follow through and schedule an appointment. Detective Hohnholt never informed Winston, O'Hara, or Erker that the results of the investigation would be used by SRS. Winston testified that he had no reason to believe that Detective Hohnholt was gathering information for SRS.

On or about September 29, 1998, SRS notified Winston that he had been substantiated for abuse of D.W. On October 8, 1998, Winston left a message for Sarah Byall, stating that he had not been interviewed, that he was going to fight her and the allegation of abuse "110%" of the way, and that his attorney was " 'going to sue the pants off' " Byall because he had been substantiated without being interviewed. On October 9, 1998, Winston again called Byall and left a message stating, " 'I demand that you call me back

before 10 a.m. this morning . . . [Y]ou have no idea who you are dealing with . . . [Y]ou are on quicksand young lady and you better watch out because I intend to fight this every inch of the way.' " Winston testified that these messages were his request for an interview. Byall did not return Winston's calls because she believed the messages were threatening. Byall's supervisor informed her that she need not respond to threatening calls.

On October 9, 1998, Winston requested a fair hearing. In his request, Winston acknowledged that the district attorney was investigating the allegations and requested a stay of the proceedings in the SRS case because of his Fifth Amendment privilege against self-incrimination.

In his March 8, 2000, initial order, Presiding Officer Good found that Winston had been provided an opportunity to be interviewed by Detective Hohnholt. To support his decision that Detective Hohnholt was a proper person to provide the opportunity for an interview, the presiding officer relied upon K.A.R. 30-46-13(a), noting that the regulation does not mandate that the opportunity to be interviewed be provided by an SRS employee. The presiding officer also relied upon Section 2323 of the Children and Family Services Policy and Procedure Manual (PPM). Section 2323 provides: "A perpetrator cannot be substantiated unless that person has been afforded an opportunity to be interviewed by SRS, *a law enforcement officer* or a duly appointed member of a multidisciplinary child protection team." (Emphasis added.) The State Appeals Committee adopted this finding.

The district court ruled that an alleged perpetrator's opportunity to be interviewed may also be provided by law enforcement. In making this ruling, the district court relied upon K.A.R. 30-46-13(a) and K.S.A. 38-1523(b), which provide that law enforcement and SRS shall conduct a joint investigation of child abuse and neglect reports and that the information obtained should be freely exchanged between the two agencies. The court reasoned that K.A.R. 30-46-13(a) and K.S.A. 38-1523(b) together supported SRS's position that the opportunity for an interview can be afforded to an alleged perpetrator by law enforcement.

A joint investigation is only authorized under K.S.A. 38-1523(b) when the report of child abuse or neglect indicates that there is serious physical injury, serious deterioration, or sexual abuse to the child and that action may be required to protect the child. Winston asserts a joint investigation was not authorized in this case because there was no evidence that D.W. suffered any physical injury. We disagree. The confidential report indicated that D.W. had been "thrown across the room by his father, hit 10 or more times and grabbed around the throat." Although the caller did not know whether D.W. had any marks or bruises from the incident, the report indicated that serious physical injury was possible, if not probable. This report sparked the joint investigation and a joint investigation was authorized under these facts.

Winston argues the interview could not be delegated to law enforcement because it is not provided for in the statutes or regulations. Furthermore, Winston asserts that even if SRS had the authority to delegate this task to law enforcement, the delegation would be unconstitutional as a violation of separation of powers.

Winston cites to Section 2311 of the PPM in support of his contention that law enforcement cannot provide an opportunity to be interviewed. Section 2311 lists the reasons for not interviewing a relevant party, such as the alleged perpetrator. One reason for not conducting an interview is if the party refused to talk with the *worker*. Winston argues that this section of the PPM demonstrates that an SRS worker has the sole authority to conduct the interview. This reasoning is flawed. The list is not all-inclusive and does not conflict with Section 2323, which provides that a perpetrator cannot be substantiated unless he or she has been given an opportunity to be interviewed by SRS, a law enforcement officer, or a duly appointed member of a multidisciplinary child protection team. Allowing law enforcement officers to interview an alleged perpetrator is not against SRS's prescribed procedures.

Winston also notes that the presiding officer held that the police officers were not agents of SRS and refused to admit the deposition testimony of the officers into evidence at the hearing. Winston contends it is illogical that the officers were agents of SRS for the purpose of conducting an interview but could not testify about that

interview. Sarah Byall testified that in a joint investigation, if the interview had been successfully scheduled she would have been present.

When Winston requested the fair hearing, the police were investigating the incident. Winston implied that he intended to invoke his Fifth Amendment privilege to avoid self-incrimination. SRS's practice of allowing the police to interview alleged perpetrators is logical. First, it avoids interference with the criminal investigation. Secondly, an SRS interview would not accomplish more, because the alleged perpetrator could still invoke his Fifth Amendment right. An individual's Fifth Amendment right to avoid self-incrimination may be invoked in any proceeding, including civil or administrative. *In re Investigation into Homicide of T.H.*, 23 Kan. App. 2d 471, 474, 932 P.2d 1023 (1997). Thus, it was not illogical for the presiding officer to find the officers were not agents of SRS when admitting their depositions, but allowing SRS to rely upon law enforcement to provide Winston an opportunity to be interviewed. SRS did not fail to follow prescribed procedures, nor are its procedures in violation of Kansas law.

## Unconstitutional Condition

Winston contends SRS's procedure of relying upon law enforcement to schedule or conduct an interview violates his due process rights because it requires him to relinquish his Fifth Amendment privilege to avoid self-incrimination.

As noted previously, the Fifth Amendment privilege to avoid self-incrimination can be invoked in civil and administrative proceedings. 23 Kan. App. 2d at 474. Thus, Winston's contention that if SRS were required to provide the opportunity to be interviewed his right to be heard would not be conditioned upon the relinquishment of his Fifth Amendment right is erroneous. Any information obtained during an interview with SRS could be used in any criminal charge arising out of the incident. If SRS had requested an interview, Winston could still have argued that his right to be heard was conditioned upon relinquishment of his Fifth Amendment right.

We previously recognized in determining when a stay in a civil proceeding should be issued, that a defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his or her Fifth Amendment right. See *State ex rel. Stovall v. Meneley*, 271 Kan. 355, Syl. ¶ 4, 22 P.3d 124 (2001). The same reasoning applies here. SRS is only mandated to provide the alleged perpetrator an opportunity to be interviewed. Winston's contention that relying upon law enforcement to provide an opportunity to be interviewed results in an unconstitutional condition is erroneous.

### Violation of Due Process Rights

Winston also alleges his due process rights were violated. Relief for this allegation is provided pursuant to K.S.A. 77-621(c)(1). Winston first alleges that SRS's failure to follow its own internal procedures deprived him of his right to due process. We need not address this argument because we have determined that SRS followed its prescribed procedures.

Secondly, Winston contends his due process rights were violated when he did not receive notice that civil proceedings had been instituted against him and was not given an opportunity to be heard prior to SRS rendering its findings of substantiation and validation for the alleged abuse of D.W.

This court has set forth the standard for evaluating a procedural due process claim on numerous occasions:

"The basic elements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Kennedy v. Board of Shawnee County Comm'rs*, 264 Kan. 776, 797-98, 958 P.2d 637 (1998). In reviewing a procedural due process claim the court must first determine whether a protected liberty or property interest is involved and, if it is, the court must then determine the nature and extent of the process which is due. [*Murphy*, 260 Kan. at 598.] A due process violation can be established only if the claimant is able to establish that he or she was denied a specific procedural protection to which he or she is entitled. The question of the procedural protection that must accompany a deprivation of a particular property right or liberty interest is resolved by a balancing test, weighing (1) the individual interest at stake, (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards, and (3) the State's interest in the procedures used, including the fiscal and administrative burdens

that the additional or substitute procedures would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976); *Murphy*, 260 Kan. at 598-99. The question of what process is due in a given case is a question of law. 260 Kan. 589, Syl. ¶ 2." *State v. Wilkinson*, 269 Kan. 603, 608-09, 9 P.3d 1 (2000).

SRS contends Winston did not have a protected property interest, *i.e.*, Winston's medical practice as a cardiothoracic surgeon would not be affected by a validation, although it recognized he may have had a protected liberty interest. SRS asserts, however, that after balancing the interests involved, Winston received the level of due process to which he was entitled.

In order to determine whether the substantiation and validation by SRS deprived Winston of a particular property right or liberty interest, a definition of the terms involved is necessary. An incident of abuse or neglect is "substantiated" if there is enough evidence that a reasonable person could conclude that an alleged incident of child abuse or neglect occurred, using the "more likely than not" standard. See K.A.R. 30-46-10(d). A person is "substantiated" as a perpetrator of child abuse or neglect if a report of abuse or neglect is substantiated and there is enough evidence, using the "more likely than not" standard, that a reasonable person could conclude who was responsible. See K.A.R. 30-46-10(e).

"(f) 'Validated' means a determination by the department of social and rehabilitation services that a substantiated perpetrator poses a danger to children and should not be permitted to operate, reside in, be employed by, or volunteer in a home or facility for the care of children licensed under provisions of article 5 of chapter 65 of the Kansas statutes annotated." K.A.R. 30-46-10(f).

SRS has established criteria for validating perpetrators. A person who meets these criteria is validated and his or her name is entered into the Kansas Child Abuse and Neglect Central Registry. PPM Section 2324. The definitions of these terms accompany the notice sent to confirmed perpetrators.

Winston alleges he was deprived of a protected liberty interest. He appears to contend that his protected liberty interest is his ability to freely maintain or work in a child care facility and to avoid the stigma which would accompany his name erroneously being placed on the statewide registry. This court has recognized that a liberty interest may be deprived without due process if the person's

standing in the community is damaged, if his or her reputation, honor, or integrity are called into question, or if a stigma or other disability attaches that infringes upon his freedom to obtain employment. *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 356, 770 P.2d 423 (1989); *Sinclair v. Schroeder*, 225 Kan. 3, 9, 586 P.2d 683 (1978). Because validation involves listing an individual on the Kansas Child Abuse and Neglect Central Registry and prohibits him or her from being employed, operating, residing, or volunteering in a child care facility, a protected liberty interest is involved.

Thus, this court must determine whether the process afforded Winston was sufficient to comply with due process of law. K.S.A. 2001 Supp. 75-3306 provides any interested party a method of appealing decisions and final actions of SRS agents and employees. SRS has further set forth the procedures for appeal in K.A.R. 30-7-64 *et seq.*

SRS regulations do not specifically provide that an alleged perpetrator must be given notice prior to substantiation or validation. The regulations only require that an alleged perpetrator be provided an opportunity to be interviewed before being validated. See K.A.R. 30-46-13. Notice is only required when SRS renders a decision to validate a perpetrator. K.A.R. 30-46-15. The notice must be in writing, include the reasons for the finding, and inform the confirmed perpetrator of his or her right to appeal the decision. K.A.R. 30-46-15. Thus, under SRS regulations, notice is not specifically mandated prior to validation.

The district court held that Winston received due process under the procedures employed. The district judge reasoned that the action which could cause damage to Winston's reputation, being listed in the registry, would not occur until Winston exhausted his appeals or failed to exercise his right to take part in the appeals process. See K.A.R. 30-46-16. He noted that Winston had full disclosure of the SRS investigative file, had subpoena power, conducted discovery, and had a full evidentiary hearing. This reasoning is logical.

This is not, as Winston seems to contend, a case in which the later proceedings are being evaluated to determine whether Win-

ston received due process overall. Instead, this is a case in which the deprivation of the liberty interest did not occur until Winston exhausted his appeals or failed to appeal SRS's finding. Until there is interference with a liberty interest, there is no guarantee of due process. See *Murphy*, 260 Kan. at 598. As long as Winston was provided notice and an opportunity to be heard at a meaningful time and in a meaningful manner before his liberty interest was abridged, due process requirements have been met.

Winston was given ample notice of his right to appeal SRS's decision and ample opportunity to tell his side of the events and to put forth witnesses in his favor. Placement on the Child Abuse and Neglect Central Registry would not occur until Winston had been provided notice and an opportunity to be heard. K.A.R. 30-46-16. Compare *Goss v. Lopez*, 419 U.S. 565, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975) (10 day *suspension* of students without a hearing violated due process).

In terms of the balancing test, the individual interest at stake prior to being listed in the Kansas Child Abuse and Neglect Central Registry is arguably little. The validation and substantiation of Winston does not infringe upon his liberty interest until he has exhausted his appeals. If he had not appealed, his liberty interest would not have been infringed until he failed to exercise his right to appeal. The risk of erroneous deprivation of the interest is also minimal because SRS is required to use the "more likely than not" standard in determining whether an individual should be substantiated, and there is little interest at stake regarding a substantiation. The State's interest, however, is great in terms of its need to address the issue quickly and efficiently. Therefore, Winston's due process rights have not been violated.

## Res Judicata

Winston contends the doctrine of res judicata barred the proceedings concerning D.W. because SRS had previously withdrawn its finding of validation on D.W. and amended its finding to unsubstantiated. SRS contends res judicata does not bar the proceedings because SRS reinstated the findings of abuse without there having been any prior judicial determination.

Res judicata (claim preclusion) prevents relitigation of previously litigated claims and consist of the following four elements: (1) same claim; (2) same parties; (3) claims were or could have been raised; and (4) a final judgment on the merits. *Neunzig v. Seaman U.S.D. 345*, 239 Kan. 654, Syl. ¶ 1, 722 P.2d 569 (1986); *In re Tax Protests & Grievances of Curtis Machine Co.*, 26 Kan. App. 2d 395, 397, 985 P.2d 725, *rev. denied* 268 Kan. 847(1999). "Res judicata precludes a second administrative proceeding when the first administrative proceeding provides the procedural protections similar to court proceedings when an agency is acting in a judicial capacity." *Parker v. Kansas Neurological Institute*, 13 Kan. App. 2d 685, 686, 778 P.2d 390, *rev. denied* 245 Kan. 785 (1989). See *Neunzig*, 239 Kan. at 660.

SRS withdrew its finding of validation for abuse of D.W. prior to a hearing and amended its finding to unsubstantiated. It appears from the record that the reason for the withdrawal was that SRS believed it had already validated Winston for the abuse of M.W. because Winston had not requested a fair hearing in M.W.'s case and the time for doing so had expired. When the presiding officer allowed Winston's untimely request for a fair hearing to stand in M.W.'s case, SRS refiled against Winston, once again substantiating and validating him for the abuse of D.W.

Regardless of the reason for the withdrawal and reinstatement of this finding, however, the proceedings up to that point had not provided the similar due process protections as those afforded by the judicial process. See *Dallinga v. Center Township*, 19 Kan. App. 2d 482, 483-84, 871 P.2d 1293, *rev. denied* 255 Kan. 1000 (1994) (administrative action is res judicata only when proceeding affords type of due process protections found in judicial process). At the time SRS withdrew its finding of validation, Winston had not yet been afforded the fundamental elements of due process, notice, and a meaningful opportunity to be heard. Thus, res judicata does not apply in this case.

Winston asserts that SRS cannot have it both ways and that if due process were afforded Winston as required, res judicata must apply. We disagree with this assertion. Winston was afforded the required level of process when he was given notice of SRS's finding

and had the opportunity to appeal the decision and have a full hearing conducted.

### Testimony of Unsubstantiated Allegations

Winston contends the presiding officer erroneously admitted and considered evidence of events other than the event that allegedly occurred on the weekend of August 23, 1998, in affirming the substantiation and validation of Winston for the emotional and physical abuse of D.W. Winston relies upon Section 2324 of the PPM in making this claim. Section 2324 provides:

"To validate an adult for inclusion in the child abuse and neglect central registry, the person must:
(A)   Have been substantiated as a perpetrator using the preponderance of the evidence standard, 'more likely than not';
(B)   Have committed one of more of the following qualifying acts:
   Any non-accidental or intentional act or failure to act toward a child which:
. . . .
4. Results in serious or permanent impairment of the child's emotional, intellectual or social development or functioning.
5. Results in the child experiencing terror or intense dread.
. . . .
8. Would likely have resulted in any of the outcomes in '1' through '7' above except discovery or intervention or accidental circumstances intervened.
9. Exhibits a pattern of continuing, repeated, or progressively more severe abuse or neglect. For purposes of determining whether a pattern exists, prior substantiations may include substantiation by Kansas or any other state, federal enclave or Native American tribe or association using the standards of that state or entity. Verified evidence of a prior conviction of a crime against a child may be counted as a prior substantiation of child abuse or neglect.
. . . .
(C)  Have been given notice of the department's decision to validate the person for the purpose of placing their name in the child abuse and neglect central registry, and
   the perpetrator has not timely appealed the decision, OR the perpetrator has appealed the decision and was not sustained by the highest level to which the decision was appealed."

Winston argues that Section 2324 limits SRS to considering only prior convictions and prior substantiations as being competent evidence in establishing a pattern of abuse. He contends that in order to protect the accused from allegations that are not supported by

substantial evidence, other allegations are not allowed to be considered. This claim is grounded upon the theory that it was arbitrary and capricious for the presiding officer to admit and rely upon these unsubstantiated allegations, a ground for relief under K.S.A. 77-621(c)(8).

SRS asserts that it is not precluded from using evidence that is obtained during the investigation of an alleged incident of abuse in determining whether there is evidence to support substantiation. As SRS points out, if Winston's argument were adopted, SRS would be required to ignore any evidence discovered during the investigation that related to prior unsubstantiated or even unreported allegations of abuse. This would be an illogical result. Section 2324 of the PPM does not prohibit SRS from using things discovered during investigation of a specific incident. Winston had access to SRS investigative files. Sarah Byall testified in her deposition that Winston was validated because he satisfied all the above quoted bases for validating a perpetrator under Section 2324 of the PPM. There is no indication that any of the evidence presented at the hearing was a surprise. Thus, there is nothing that would preclude this information from being used to substantiate and validate a perpetrator where the alleged perpetrator had notice of the information.

## SUBSTANTIAL EVIDENCE OF ABUSE

Winston contends there was not substantial evidence to support the findings that he physically abused D.W. and emotionally abused D.W. and M.W. SRS asserts to the contrary, contending there was substantial evidence to support these findings.

As stated above, substantial evidence is such legal and relevant evidence as a reasonable person would consider sufficient to support a conclusion. See *Sokol*, 267 Kan. at 746. In determining whether there is sufficient evidence, the appellate court may not reweigh the facts or substitute its judgment for that of the agency. 267 Kan. at 746. An agency decision that is not supported by substantial evidence is a ground for relief under the KJRA, pursuant to K.S.A. 77-621(c)(7).

## Physical Abuse

Winston contends there was not substantial evidence to support the finding of physical abuse against D.W. because there was not substantial evidence establishing that any physical abuse occurred during the visitation at his apartment in August 1998. Specifically, Winston cites to the fact there was no bruising or marks that were observed as a result of the alleged abuse, that Winston's version of events is credible because D.W. has ADHD, and that Julia, who provided the majority of the background information that led to the finding, had the most to gain from providing this harmful testimony.

K.A.R. 30-46-10(j) defines physical abuse as "non-accidental or intentional action or inaction that results in bodily injury or that presents a likelihood of death or of bodily injury." Thus, the fact no marks or bruises were observed on D.W. is not conclusive in determining whether he was physically abused. D.W. told Detective Hohnholt and Sarah Byall that Winston picked him up by the neck, pushed his face into the corner, which caused him to have difficulty breathing, and hit him several times with his (Winston's) fists and with a tennis shoe. M.W. reported that Winston had picked D.W. up by the neck and pushed him face-first into the wall, and that Winston had hit D.W. so hard that day that Winston left a handprint. Julia reported that both M.W. and D.W. had told her the same about the incident. In addition to the prior abuse which Julia told Detective Hohnholt and Sarah Byall about, M.W. and D.W. also indicated that Winston had physically abused D.W. on prior occasions, stating that he would sometimes sit on D.W., strangle him, and put a pillow over his face so he could not breathe.

There is no doubt that these facts constitute substantial evidence that supports a finding that Winston physically abused D.W.

## Emotional Abuse

Winston also contends there was not substantial evidence to support the finding that he emotionally abused M.W. and D.W.

" 'Mental or emotional abuse' means acts or omissions that impair a child's social, emotional, or intellectual functioning or present a likelihood of such impairment. Emotional abuse shall include the following:

"(1) Terrorizing a child, by creating a climate of fear or engaging in violent or threatening behavior toward the child or toward others in the child's presence that demonstrates a flagrant disregard for the child"; K.A.R. 30-46-10(g).

There was substantial evidence to support the finding that Winston emotionally abused both D.W. and M.W. D.W. was so terrified of his father that he refused to enter the same room during the supervised visitation in January 1999 without police protection. D.W. also reported to Sarah Byall that he was " 'very afraid' " of his father. D.W.'s fear of his father was apparent to Janice Mueller during the divorce counseling group discussions. M.W.'s reaction to the visitation, as well as her journal entries, constitute substantial evidence that Winston abused M.W. As the presiding officer noted, the evidence is overwhelming that Winston emotionally abused both children.

Mueller testified that after Julia and Winston separated she observed a change in M.W.'s and D.W.'s behavior in that they opened up to others. Winston contends that Mueller's testimony diminishes the claim that he has somehow interfered with the children's social and emotional functioning. Winston, however, misconstrues the testimony. The testimony supports the finding that Winston has impaired their social and emotional functioning. It was only after Winston was no longer a constant in the children's lives that they began to open up to others and participate.

Winston also contends that evidence supporting the finding of emotional abuse of M.W. was based on events other than the courthouse visitation and, thus, any decision that he emotionally abused M.W. was rendered without jurisdiction. This argument has already been addressed previously. During the investigation of the alleged incident of sexual abuse, evidence was discovered that would support the finding of emotional abuse. The reversal of SRS's validation of Winston for sexual abuse does not undermine the fact that evidence of emotional abuse remained. Winston was aware that SRS was validating him for the emotional abuse of M.W. Thus, it was not beyond the jurisdiction of SRS to render a finding of emotional abuse under the circumstances.

## PRESIDING OFFICER'S ALLEGED ERROR

Winston contends the presiding officer's evidentiary decisions and other rulings were arbitrary and capricious and favored SRS.

A ruling that is arbitrary and capricious is a ground for relief under the KJRA pursuant to K.S.A. 77-621(c)(8). Winston cites to specific instances in his brief, which he contends demonstrate that the presiding officer acted more favorably toward SRS.

After reviewing the entire record of the hearing, there is no evidence of favoritism toward SRS or bias against Winston. The presiding officer took an open approach to the admission of evidence and applied this approach equally to both sides. Winston points out only those instances in which a ruling did not go in his favor and neglects to point out the numerous instances in which the presiding officer allowed questioning and evidence over SRS's objection.

Winston also contends in his brief that the admission of Julia's statements through the testimony of Sarah Byall and Detective Hohnholt was arbitrary and capricious. Julia did not testify at the hearing; however, Julia's statements were admitted into evidence through the reports created during the investigation and through testimony of other witnesses. The basis for Winston's objection to the admission of the evidence is that Julia refused to cooperate during her deposition and that he was deprived of an opportunity to cross-examine her because she did not testify. We find nothing in the record that indicates Winston did anything to compel Julia to submit to further questioning. The only action documented in the record was Winston's motion in limine to exclude all of Julia's testimony.

In administrative proceedings conducted under the Kansas Administrative Procedure Act, K.S.A. 77-501 *et seq.*, the presiding officer is not bound by the technical rules of evidence and evidence need not be excluded solely because it is hearsay. K.S.A. 77-524(a). Thus, the fact the presiding officer allowed Julia's statements to be admitted into evidence through reports and testimony of others was not arbitrary and capricious. As for the fact Winston was not able to cross-examine Julia on those statements, Winston could have called Julia as a witness or obtained an order requiring Julia to comply with the discovery request and submit to a subsequent deposition. See K.S.A. 77-522. It must be noted that Julia's failure

to cooperate in the deposition was the result of her and her own attorney, not as the result of action by SRS.

The presiding officer overruled Winston's objection to the admission of Julia's statements in the reports on the grounds that Winston had statutory remedies available to him, such as going to district court, as the result of Julia's failure to fully submit to examination in her deposition. The presiding officer held that it was Winston's duty to pursue those remedies.

We note that when Winston's counsel brought Julia's actions to the attention of the presiding officer, the presiding officer informed him that he would not compel Julia to respond. The presiding officer stated at the hearing that he meant to inform Winston's counsel that he, himself, did not have the physical ability to pry open Julia's mouth and make her talk and did not mean to mislead counsel about available remedies. The presiding officer also noted that Winston's counsel could have read the statutes and determined what remedies were available.

The district court, in affirming the decision and finding that Winston's due process rights had not been violated, noted that the presiding officer acted within his authority in admitting the hearsay statements of Julia and that although this procedure resulted in Winston having the burden to produce Julia as his witness in order to examine her and test her credibility, there was no indication that Winston could not have done so. The presiding officer's rulings on the admission of evidence were not arbitrary and capricious.

Affirmed.