(202 P.3d 27)
No. 99,687

IN THE MATTER OF THE APPLICATION TO ADOPT J.M.D. AND K.N.D., MINOR CHILDREN.

Opinion filed February 20, 2009.

*Elizabeth Lea Henry*, of Henry & Mathewson, P.A., of Wichita, for appellant natural father.

*Martin W. Bauer*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellee stepfather.

Before CAPLINGER, P.J., MARQUARDT and STANDRIDGE, JJ.

STANDRIDGE, J.: M.D. (Father) appeals the district court's order terminating parental rights to his children J.M.D. and K.N.D. and permitting the children's stepfather (Stepfather) to adopt them. We reverse the district court's decision.

## Facts

Father and S.H. (Mother) were married in 1993 in Missouri. During the marriage, Father and Mother had two children: J.M.D. was born in 1996, and K.N.D. was born in 1998. In 1999, J.M.D. was diagnosed with cancer. As a result, J.M.D. underwent numerous hospitalizations, as well as a year of chemotherapy and radiation treatments.

In October 2001, Father and Mother were named managing conservators, or guardians, of Mother's 5-year-old stepsister (H.R.B.) and Mother's 3-year-old half-sister (L.H.D.).

During the summer of 2002, Father was unemployed and, as a result, became the primary caretaker for all four children at the

family's home in Missouri. On July 18, 2002, Father called Mother at work to report that L.H.D. had been flown to the hospital as a result of serious physical injuries. L.H.D. ultimately died from these injuries. Social service workers removed the remaining three children from the home in order to investigate what role Father may have played in L.H.D.'s injuries and death.

On July 23, 2002, Father was charged with felony abuse of a child. More specifically, charges were lodged against Father for inflicting cruel and inhuman punishment on his 3-year-old ward by "beating, kicking, hitting, knocking to the ground and by throwing water on L.H.D." Father adamantly denied the physical abuse with which he was charged and was released on bond pending trial, a condition of which was to refrain from having any contact with the children.

Meanwhile, social service officials informed Mother that in order to regain custody of the three remaining children, she would have to divorce Father and refrain from any further contact with him. Mother was granted a default divorce on October 23, 2002. As part of the divorce, Mother was given sole custody of the children and Father was ordered to pay $254 per month in child support.

On December 8, 2002, Father's bond was revoked on grounds that he met with his children in violation of the court's order prohibiting contact with them. Although still maintaining his innocence, Father ultimately pled guilty to the charges against him. To that end, Father stated that Mother requested he take the plea agreement, even though it involved a longer sentence than Father hoped, so the children would not have to testify.

In March 2003, Mother moved to Wichita with all three children. In September 2003, Father was sentenced to a term of 17 years in prison, with a mandatory release date of December 8, 2014.

In August 2004, Mother married Stepfather.

In June 2007, Stepfather filed a petition, with Mother's consent, to adopt J.M.D., and K.N.D. Counsel for Stepfather filed a petition for habeas corpus to bring Father from the Missouri South Central Correctional Center to Kansas to participate in the adoption trial. Because Missouri prison officials refused to honor the Kansas ha-

beas corpus writ, the court ordered Father to participate in the trial by telephone. A trial was set for October 24, 2007.

Citing his right to due process, Father requested to delay the trial until he could appear in person. The court denied the motion, noting that Stepfather had made every effort to get Father to Kansas for trial. The court further noted that, although Father's earliest possible parole date for the 17-year sentence was July 2008, there was no guarantee Father would be granted parole on that date or at any time prior to his mandatory release date of December 8, 2014. The district court specifically found that, given the children's interest in a timely decision and the demands of judicial economy, Father's ability to participate by telephone satisfied his right to due process.

The trial commenced on October 24, 2007, and was completed on November 1, 2007.

During trial, Stepfather presented the testimony of a school counselor and the children's treating psychologist concerning the impact of L.H.D.'s death and Father's incarceration on J.M.D. and K.N.D. The treating psychologist noted the children had experienced a number of additional stressors as well, including J.M.D.'s cancer, placement in foster care and separation from their mother for 3 months, and the illness and subsequent death of their grandmother from cancer. Both the counselor and the treating psychologist testified that the children suffered from anxiety and symptoms of posttraumatic stress disorder and would benefit from the closure and permanency offered by adoption.

Father's sister, Tina Riley, also testified. Tina stated that while Father was in prison, she remained in contact with Mother and the children through e-mail and personal visits. Tina testified that at the beginning, Father would call and talk to the children during these visits, but then Mother asked Tina not to allow Father to call while the children were there. Tina stated she would buy $10 and $20 gift cards, at Father's request and expense, for the children. On behalf of Father, Tina also sent the children cards and money on their birthdays and for Christmas. Tina reported that Father directed his veterans disability check be sent to her in order to pay for the purchases of gifts and gift cards for the children.

Father testified via telephone. Father recalled spending time with the children when they were young and how much fun they had together just playing and going swimming, camping, and fishing. Father testified he helped with meals and baths, and, during the summer of 2002, he was a stay-at-home dad.

At the end of the hearing, the court made lengthy factual findings, which it incorporated into its subsequent journal entry. In its conclusions of law, the court held Father failed to assume the duties of a parent for 2 consecutive years prior to the filing of the adoption petition. The court also determined Father was unfit to be a parent and that adoption by Stepfather was in the best interests of the children. For these reasons, the district court terminated Father's parental rights and determined it was not necessary to have Father's consent in order to grant Stepfather's petition for adoption.

On appeal, Father contends: (1) The district court misinterpreted and misapplied the stepparent adoption statute by considering Father's fitness and the best interests of the children as overriding factors in granting Stepfather's petition for adoption; (2) there was insufficient evidence to support a finding that Father's consent to the adoption was not required; and (3) Father was denied due process when the court refused to continue the trial until he could be released from prison and attend the trial in person.

## Analysis

### 1. K.S.A. 2008 Supp. 59-2136(d)

Father asserts the district court misinterpreted and misapplied the stepparent adoption statute, K.S.A. 2008 Supp. 59-2136(d). More specifically, Father argues that the court improperly considered Father's fitness and the best interests of the children as overriding factors in terminating his parental rights and granting Stepfather's petition for adoption. In so arguing, Father concedes the stepparent adoption statute was revised in 2006 to add "best interests of the child" and "fitness of the nonconsenting parent" as factors the court may consider to determine whether a petition for stepparent adoption should be granted. See L. 2006, ch. 22, sec. 1(d). Father argues, however, that these two factors may be con-

sidered only if the court independently decides, *without considering these two factors*, that consent to the adoption by the biological father is not required. Father maintains that in order to decide his consent is not required, the court must find he failed to carry out his parental duties on both sides of the parental ledger—financial support and emotional support.

We agree with Father's interpretation of K.S.A. 2008 Supp. 59-2136(d). We disagree, however, with Father's contention that the district court misapplied the statute in considering Father's fitness and the best interests of the children without first making an independent finding that Father's consent to the adoption was not required.

### a. Interpretation of the Statute

K.S.A. 2008 Supp. 59-2136(d) provides in relevant part:

"[A natural father's consent to an adoption is required] unless such father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition for adoption . . . . In determining whether a father's consent is required under this subsection, the court may disregard incidental visitations, contacts, communications or contributions. . . . [T]here shall be a rebuttable presumption that if the father . . . has knowingly failed to provide a substantial portion of the child support as required by judicial decree, when financially able to do so, for a period of two years next preceding the filing of the petition for adoption, then such father has failed or refused to assume the duties of a parent. The court may consider the best interests of the child and the fitness of the nonconsenting parent in determining whether a stepparent adoption should be granted."

In the case of *In re Adoption of G.L.V.*, 286 Kan. 1034, 190 P.3d 245 (2008), our Supreme Court examined prior cases relating to this statute and concluded that "all surrounding circumstances are to be considered when determining whether a natural parent must consent to a stepparent adoption—that is, whether the natural parent has 'assume[d] the duties of a parent for two consecutive years next preceding the filing of the petition.' [Citations omitted.]" 286 Kan. at 1053-54.

To that end, the courts use a "two-column ledger" approach in analyzing the requirements of K.S.A. 2008 Supp. 59-2136(d). See 286 Kan. at 1054; *In re Adoption of B.M.W.*, 268 Kan. 871, 882, 2

P.3d 159 (2000). First, the adoption petitioner must show that the parent has failed to demonstrate love and affection toward the child by failing to visit, contact, communicate with, or make contributions to the child for the 2 years preceding the filing of the adoption petition. Second, the adoption petitioner must show that the parent has failed to support the child by failing to provide a substantial portion of child support "as required by judicial decree," if financially able to do so, for the 2 years preceding the filing of the petition. K.S.A. 2008 Supp. 59-2136(d); see *In re Adoption of G.L.V.*, 286 Kan. at 1053-54. *G.L.V.* reaffirmed that these two elements are the *sine qua non* of a K.S.A. 2008 Supp. 59-2136(d) analysis because these duties are specifically contemplated by the statute. See 286 Kan. at 1054.

The "best interests of the child" and the "parental unfitness" factors were added to K.S.A. 2008 Supp. 59-2136(d) in 2006. The effect of the 2006 amendment with respect to the best interests of the child consideration, according to our Supreme Court, was to provide a trial court

"with additional discretionary powers to consider the best interests of the child in denying the adoption—even where a natural parent has not assumed the duties of a parent as articulated by this court—for unique reasons. For example, a court may determine, based upon testimony of the child or other evidence, that the child desires to remain the son or daughter of the natural parent based upon the parent's promise of commitment to the child, based upon friction in the stepparent family, or a pattern of instability in the stepparent history." *In re Adoption of G.L.V.*, 286 Kan. at 1064.

Although the Supreme Court did not discuss the significance of the "parental unfitness" provision, the Court of Appeals majority in *G.L.V.* specifically stated:

"Simply put, the court may consider the best interests of the child and the fitness of the nonconsenting parent in a stepparent adoption case, but it can only grant the adoption without the natural parent's consent if [the court first finds] the natural parent has failed to fulfill his or her parental duties under the statute." *In re Adoption of G.L.V.*, 38 Kan. App. 2d 144, 152, 163 P.3d 334 (2007), *aff'd* 286 Kan. 1034, 190 P.3d 245 (2008).

Consistent with the plain language of the statute and relevant case law interpreting the statutory language, we conclude that de-

terminations regarding the best interests of the child and the fitness of the nonconsenting parent do not "permit a court to override the requirement" in K.S.A. 2008 Supp. 59-2136(d) "of mandatory consent when a natural parent has assumed his or her parental responsibilities." *In re Adoption of G.L.V.*, 286 Kan. at 1064-65.

### b. The District Court's Application of the Statute

There is no dispute that the district court determined Father was unfit to be a parent and that it was in the best interests of the children to grant Stepfather's petition for adoption. Instead, the dispute here is (1) whether the court erroneously considered these factors in conjunction with its determination that Father's consent to the adoption was not required or (2) whether the court resolved the consent issue before considering fitness and the best interests of the children as relevant factors to the overall question of whether the Father's parental rights should be terminated and the petition for adoption should be granted. We find it was the latter.

To that end, the district court specifically found that "[Father] failed to assume the duties of a parent for two consecutive years next preceding the filing of the petition." The court concluded financial support provided by Father for the 2 years prior to the petition was incidental, did not satisfy the court order, and was not what Father could have contributed. The court further concluded that, due to his incarceration and overall physical absence from his family as the result of his own conduct, Father's contact with his children was only incidental.

These conclusions sufficiently establish that the court made the decision that Father's consent to the adoption was not required without taking into consideration Father's fitness to be a parent or the best interests of the children. It was only after making this preliminary decision regarding consent that the district court independently considered Father's fitness and the best interests of the children as relevant factors to the overall question of whether the petition for adoption should be granted. Regardless of whether, in the next section, we find sufficient evidence to support the district court's decision that Father's consent was not required, we do

find the district court did not err in its application of the analysis required by the stepparent adoption statute.

## 2. Sufficiency of the Evidence

Even if the district court correctly applied the requisite statutory analysis, Father goes on to claim that, under this analysis, the district court erred in finding Father's consent was not required. More specifically, Father states there was insufficient evidence to find Father failed to assume his parental duties for the 2 years before the petition for adoption was filed. Here, the applicable 2-year period ran from June 2005 to June 2007.

Whether a parent has refused or failed to assume parental duties for the 2 years prior to the filing of the adoption petition presents a question of fact. Thus, an appellate court reviews the decision to determine whether it is supported by substantial competent evidence presented at a hearing on the matter. An appellate court does not reweigh the evidence or pass on the credibility of witnesses. Instead, an appellate court reviews the facts in the light most favorable to the prevailing party to determine whether the decision of the trial court is properly supported by the evidence. *In re Adoption of A.J.P.*, 24 Kan. App. 2d 891, 892-93, 953 P.2d 1387 (1998).

The duties of a parent under K.S.A. 2008 Supp. 59-2136(d) require not only financial support, but also love, affection, and interest toward the children. See *In re Adoption of K.J.B.*, 265 Kan. 90, Syl. ¶ 3, 959 P.2d 853 (1998), *modified in part by In re Adoption of G.L.V.*, 286 Kan. at 1058-61. The statute is to be strictly construed in favor of maintaining the rights of natural parents. 265 Kan. at 95. When determining whether a nonconsenting parent in an adoption proceeding has failed to assume parental duties for 2 consecutive years, all of the surrounding circumstances must be considered. *In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987).

We note that when a parent is incarcerated, as here, different standards must be applied than when the parent is free from such constraints. See *F.A.R.*, 242 Kan. at 236. "When a nonconsenting parent is incarcerated and unable to fulfill the customary parental

duties required of an unrestrained parent, the court must determine whether such parent has pursued the opportunities and options which may be available to carry out such duties to the best of his or her ability." *In re Adoption of S.E.B.*, 257 Kan. 266, 273, 891 P.2d 440 (1995).

### a. Financial Support

As part of the October 23, 2002, divorce decree, Father was ordered to pay $254 per month in child support. From June 2005 through June 2007, which is the 2-year period relevant to our analysis, Father earned prison wages of approximately $20 per month and received his veterans disability payments of approximately $105 per month. During this time period, Father directed his veterans disability checks be sent to his sister so that she could pay for the purchase of gifts and gift cards for the children. Thus, although there is no dispute that the funds were used to buy gifts for the children, there also is no dispute that none of the $105 per month was directed to pay his child support obligation from June 2005 to June 2007.

In September 2006, Father was contacted by child support enforcement authorities regarding his failure to pay child support. Given his limited income, Father requested a reduction in his monthly obligation. The request was granted, and his monthly child support obligation was reduced from $254 to $5. Based on the arrearage, Father instructed child support payments in an amount of $8.50, which is 170% of the required amount, be withdrawn directly from his prison wages. Thus, Father was financially able to pay, and did pay, his $5 court-ordered child support obligation from September 2006 through June 2007.

Notwithstanding these facts, the district court found a rebuttable presumption under K.S.A. 2008 Supp. 59-2136(d) that Father "knowingly failed to provide a substantial portion of the child support as required by judicial decree, when financially able to do so, for a period of two years next preceding the filing of the petition for adoption." Based on the undisputed evidence that Father satisfied in full his court-ordered child support obligation for the 10 months immediately prior to Stepfather's filing of the petition for

adoption, we find the district court's conclusion that Father failed to meet his financial obligations for the entire 2-year period at issue is not supported by substantial competent evidence.

Even if Father had failed to fully pay his child support for those 10 months, the district court's finding that Father failed to assume his financial parental duties for the full 2-year period would still be in error. Although Father failed to pay $254 per month in child support for the 14-month period from June 2005 through August 2006, Father's income ($20 per month in prison wages and $105 per month for veterans disability benefits) rendered him *financially unable* under the statute to pay his $254 court-ordered child support obligation during this 14-month period. See K.S.A. 2008 Supp. 59-2136(d) (specifically stating that a knowing failure to provide a substantial portion of court-ordered child support can be found *only when the parent at issue is financially able to pay* the amount ordered).

The fact that Father failed during this time period to request a reduction in child support or make partial payments of some sort does not render him financially able to pay the $254 per month. To that end, the statute does not require a parent to provide court-ordered child support *to the extent* to which the parent is financially able in order to establish such parent has assumed his or her duties under K.S.A. 2008 Supp. 59-2136(d). Instead, the statute plainly states that financial inability to meet court-ordered child support cannot be used as evidence that such parent failed to assume the financial duties of a parent. See *In re Application to Adopt H.B.S.C.*, 28 Kan. App. 2d 191, 201, 12 P.3d 916 (2000) (when parent is incarcerated and unable to provide financially for child, the side of ledger dealing with financial support becomes irrelevant and focus of inquiry must shift to love and affection side of parenting). For these reasons, we find the district court's conclusion that—from June 2005 through August 2006—Father was financially able but failed to assume the financial duties of a parent pursuant to K.S.A. 2008 Supp. 59-2136(d) is not supported by substantial competent evidence.

### b. Emotional Support

In order to support a determination terminating parental rights and, therefore, that the father's consent to a stepparent adoption is not required, "there must be a failure of both financial *and* emotional support." (Emphasis added.) *In re Application to Adopt H.B.S.C.*, 28 Kan. App. 2d at 201 (citing *In re Adoption of K.J.B.*, 265 Kan. at 101-02). In the preceding section, we found insufficient evidence to support the district court's finding that Father failed to provide financial support as required by the statute. We make a similar finding with regard to the district court's finding that Father failed to provide emotional support.

To determine whether a father's consent is required with regard to the emotional side of the ledger, K.S.A. 2008 Supp. 59-2136(d) provides that "the court may disregard incidental visitations, contacts, communications or contributions." " 'Incidental' has been defined as 'casual, of minor importance, insignificant, and of little consequence.' [Citation omitted.]" *In re Adoption of C.R.D.*, 21 Kan. App. 2d 94, 98, 897 P.2d 181 (1995), *modified in part by In re Adoption of G.L.V.*, 286 Kan. at 1058-61. The question of whether the contacts between the parent and the children are incidental such that the contact may be disregarded is reviewed on a case-by-case basis. *In re Adoption of A.J.P.*, 24 Kan. App. 2d at 892-93.

When a parent is in prison, "[t]he trial court must consider whether the [incarcerated] parent has made reasonable attempts, under all the circumstances, to maintain a close relationship with his or her child, and whether those attempts are sufficient to require the parent's consent be given to an adoption. [Citation omitted.]" *In re Adoption of A.J.P.*, 24 Kan. App. 2d at 893.

Here, the district court found Father failed the emotional support side of the ledger because his voluntary criminal acts removed him from his children. We find whether Father was incarcerated as a result of his own conduct is immaterial to whether Father made reasonable attempts while incarcerated to maintain a close relationship with his children pursuant to K.S.A. 2008 Supp. 59-2136(d). Under the reasoning of the district court, no incarcerated parent could ever fulfill his parental duty of love and affection.

The district court further found Father failed the emotional support side of the ledger because any efforts he did make to contact or communicate with the children were minor and incidental. This court's review is limited to determining whether substantial competent evidence exists to support these findings. See *In re Adoption of A.J.P.*, 24 Kan. App. 2d at 892-94.

While Father was in prison, Mother facilitated phone contact between Father and the children. Mother also arranged for the children to visit their paternal aunt, during which time an estimated three or four telephone visits between Father and the children took place. On one occasion, Mother took the children to personally visit Father at the prison.

Father sent letters to his children every week. In addition, Father participated in a program that allowed him to tape record himself reading a book to the children. Father sent 14 books and recordings to his children through this program. Father also made sure Christmas and birthday gifts were sent to the children each year.

Mother readily admitted Father wrote to the children on a weekly basis. Mother, however, stated that she became concerned about the letters when Father began making references to time Father and the children would spend together when Father was released from prison. Mother felt these references were misleading, in that the children were unable to realize the time frame involved.

In March 2006, Mother let lapse the lease on her post office box, the mail address to which Father sent letters to his children. Mother maintains she accidentally let the lease lapse, as she was occupied with her mother's cancer and her own miscarriage. In light of this lapse, Father obtained a calling card and thereafter called the children once a month.

Even if we review the facts presented above in a light most favorable to Stepfather, we conclude there simply is insufficient evidence to support the district court's finding that Father did not make reasonable efforts to contact or communicate with his children and that any such contact that did occur was minor and incidental. In so concluding, we have taken into account, as we are

required to do, that by virtue of his incarceration, Father possessed limited control over his ability to contact and communicate with his children. For example, he sent letters to his children every week until Mother let the post office box lapse. Even then, Father switched to monthly telephone calls instead of breaking off communication. And, although Father regularly spoke to his children when they went to visit his sister, Mother ultimately asked that his sister stop facilitating this communication. Given the constraints imposed upon him, we are not persuaded that Father failed to make reasonable efforts to maintain significant contact with his children.

Based on the discussion above, we find insufficient evidence to support the district court's finding that Father failed to assume his parental duties in the 2 years prior to the filing of the adoption petition and the termination of his parental rights. Accordingly, we conclude Father's consent to the adoption was required under K.S.A. 2008 Supp. 59-2136(d). In so concluding, we do not consider, and are prohibited from considering in this stepparent adoption proceeding, the events leading up to Father's incarceration or his fitness as a parent in light of the events that transpired.

Because Father's consent was required, the district court erred in relying on subsequent determinations regarding Father's fitness and the best interests of the children in granting Stepfather's petition for adoption. See *In re Adoption of G.L.V.*, 286 Kan. at 1064-65 (Determinations regarding the best interests of the child and the fitness of the nonconsenting parent do not "permit a court to override the requirement in K.S.A. 2007 Supp. 59-2136[d] of mandatory consent when a natural parent has assumed his or her parental responsibilities.").

### 3. Due Process

Father also complains on appeal that he was denied due process when the district court refused to continue the trial until after his possible release on parole in July 2008. Father renewed his objection to his requested delay at the beginning of the trial.

The basic elements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful

manner. Whether due process under the Fourteenth Amendment to the United States Constitution has been protected in a particular case is a question of law. *In re J.D.*, 31 Kan. App. 2d 658, 666, 70 P.3d 700 (2003).

In this case, Stepfather took every reasonable action to permit Father's presence at the adoption hearing, even filing a petition for habeas corpus with Missouri prison officials. When that request was denied, Father was allowed to proceed via telephone, during which he heard all the testimony and was able to testify on his own behalf. Father also was allowed several breaks, which required everyone except Father's attorney to leave the courtroom so the two could consult about the process of the hearing.

We find Father had both notice and an opportunity to be heard at a meaningful time and in a meaningful manner. Given Father was provided with the appropriate level of due process to which he was entitled, we affirm the district court's decision to deny Father's request for an 8- to 12-month continuance based on the mere possibility that Father would be paroled. As noted in other contexts involving children and their need for permanency, time frames are viewed from the children's perspective, not the parent's, as the time perception of children differs from that of an adult. *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008).

### 4. Attorney Fees

Appellate counsel was appointed by the district court to pursue this appeal on behalf of Father, who is indigent. Pursuant to this appointment, appellate counsel now seeks payment of costs and attorney fees incurred in conjunction with this appeal. Notably, Stepfather has not filed any opposition to this request for costs and fees.

This court may award attorney fees for services on appeal in any case where the district court had authority to award the fees. Supreme Court Rule 7.07(b) (2008 Kan. Ct. R. Annot. 60). To that end, we note that the district court here did, in fact, award attorney fees to appointed trial counsel for Father in the proceeding below. We further note that the attorney fees were assessed, not against the county, but against Stepfather pursuant to a proposed journal

entry to which both Stepfather and Father agreed. For the reasons stated below, we find the district court had full authority to approve the parties' jointly proposed journal entry ordering Stepfather to pay the fees for Father's court-appointed attorney.

In *In re Adoption of D.S.D.*, 28 Kan. App. 2d 686, 19 P.3d 204 (2001), also a stepparent adoption case, a panel of this court found the district court had authority to award attorney fees. In that case, the district court appointed counsel to represent the father in an adoption proceeding in which father's parental rights ultimately were terminated. Once the adoption was finalized, the district court assessed as costs a portion of the biological father's attorney fees against the adoptive parents. The adoptive parents appealed the district court's order.

In evaluating the adoptive parents' appeal, a panel of this court cited K.S.A. 59-2134(c), which states that the " 'costs of the adoption proceedings *shall be paid by the petitioner* or as assessed by the court.' " (Emphasis added.) 28 Kan. App. 2d at 687. Although this particular statute does not specifically reference attorney fees, the *In re Adoption of D.S.D.* court read this language in conjunction with K.S.A. 2000 Supp. 59-104(d), which specifically defined the word "costs" (as used in Chapter 59) to include attorney fees.

K.S.A. 2008 Supp. 59-104(d) states in relevant part:

"(d) *Additional court costs.* Other fees and expenses to be assessed as additional court costs shall be approved by the court, unless specifically fixed by statute. *Other fees shall include . . . attorney fees . . . .* All additional court costs shall be taxed and billed against the parties or estate as directed by the court." (Emphasis added.)

The *In re Adoption of D.S.D.* court concluded that the legislature "intended that the fees of an attorney appointed to represent an indigent biological parent could be included as costs that may be assessed against a petitioner in an adoption proceeding." 28 Kan. App. 2d at 688. For this reason, the court ultimately held that the district court had authority to assess the attorney fees of the biological father's court-appointed attorney against the adoptive parents. 28 Kan. App. 2d at 689.

Applying *In re Adoption of D.S.D.* to this case, the district court below had the authority to assess the fees of Father's court-ap-

pointed trial counsel against Stepfather. Therefore, we have discretionary authority to assess against Stepfather the attorney fees incurred by Father's court-appointed appellate attorney. See Supreme Court Rule 7.07(b). The question is whether we should exercise our discretion to do so.

While it may appear harsh to require a prospective adoptive parent to pay attorney fees for an attorney appointed to represent the parental rights of a indigent biological parent, this is precisely the result the legislature intended. To that end, our legislature did not create a provision in the Kansas Adoption and Relinquishment Act, K.S.A. 59-2111 *et seq.*, providing for payment of an indigent parent's court-appointed attorney *by the county*. Legislative intent for payment of attorney fees by the county in other matters are, however, expressly stated elsewhere in our code. For example, payment of certain attorney fees from the county's general fund is provided in the Kansas Parentage Act, K.S.A. 38-1122 (providing for payment of indigent party's portion of reasonable fees of counsel and child's guardian ad litem from county's general fund); the Kansas Juvenile Offenders Code, K.S.A. 2008 Supp. 38-1613(b) (providing for payment of court-appointed attorney fees from county's general fund in juvenile offender cases); and the Revised Kansas Code for Care of Children, K.S.A. 2008 Supp. 38-2205(e) and K.S.A. 2008 Supp. 38-2215(b) (providing for payment of fees for child's guardian ad litem or attorney appointed for parents from county's general fund). Simply put, the legislature did not specify that the attorney fees of an indigent parent are to be paid by the county but, instead, expressly provided in K.S.A. 2008 Supp. 59-104(d) and K.S.A. 59-2134(c) that attorney fees may be assessed against prospective adoptive parents. Accordingly, we find assessing attorney fees against Stepfather (as the petitioner) is appropriate here.

Given this finding, we turn now to the reasonableness of the amount of fees requested. Counsel attaches to her motion an affidavit setting forth a detailed billing statement for a total of 47.6 hours of attorney time and $133.76 in total costs advanced to Father. The attorney fees set forth are predicated on a billing rate of $200 per hour. Counsel avers that this rate is based on fee rates

customarily charged in Wichita, Kansas, and her experience and ability as an attorney with 29 years of practice.

Although we do not dispute that $200 per hour is the customary rate in Wichita for a case such as this with an attorney of counsel's experience and ability, we do not think assessing fees against Stepfather at such a rate is reasonable. To that end, we will use our discretion to award fees for appointed counsel's time on appeal at a rate of $80 per hour, which is the rate our legislature has designated to compensate court-appointed counsel for representing indigent defendants in criminal cases. See K.S.A. 22-4507(c) (requiring court-appointed attorneys to be compensated at rate of $80 per hour). Accordingly, appellate counsel's motion, which is unopposed, is granted and Father's appellate attorney fees and costs are hereby assessed against Stepfather in the amount of $3,941.76 (47.6 hours at $80/hour plus $133.76 in costs).

Reversed.

MARQUARDT, J.: I respectfully dissent from the majority's interpretation of K.S.A. 2008 Supp. 59-2136(d) that Father's consent is absolutely required for a stepparent adoption unless he has failed or refused to financially and emotionally support his children for 2 consecutive years preceding the filing of Stepfather's petition for adoption.

Mother and Father had two children; J.D., born in 1996, and K.D., born in 1998. Mother and Father were appointed managing conservators (guardians) of Mother's 5-year-old stepsister, H.B.H., and Mother's 3-year-old half-sister, L.H.D. L.H.D. was fatally injured while in the sole care of Father on July 18, 2002. Father was arrested for the death of L.H.D. but was released on bond. He violated a condition of his bond and was incarcerated in December 2002. As a result of L.H.D.'s death, Father entered an *Alford* plea to felony abuse of a child, see *North Carolina v. Alford,* 400 U.S. 25, 38, 27 L. Ed. 2d 162, 91 S. Ct. 160 (1970), and in September 2003, he was sentenced to prison for 17 years.

The flaw in the majority's analysis is three-fold: (1) It found that Father has financially and emotionally supported his children in the 2 years preceding the filing of the petition for adoption; (2) it

misconstrues the word "must" in the context of the statute as synonymous with the word "shall"; and, (3) it completely ignores the final sentence of K.S.A. 2008 Supp. 59-2136(d) which states: "The court may consider the best interests of the child and the fitness of the nonconsenting parent in determining whether a stepparent adoption should be granted."

According to Black's Law Dictionary 1019 (6th ed. 1990), the word "must" is defined as follows:

"This word, like the word 'shall,' is primarily of mandatory effect [citation omitted]; and in that sense is used in antithesis to 'may'. But this meaning of the word is not the only one, and it is often used in a merely directory sense, and consequently is a synonym for the word 'may' not only in a permissive sense of that word, but also in the mandatory sense which it sometimes has."

If the legislature intended that the district court should only consider the issue of Father's consent or lack thereof, there would be no purpose for including the last sentence of K.S.A. 2008 Supp. 59-2136(d).

The majority claims that Father was financially unable to support his children as ordered by the district court in 2002; however, he received his veterans disability payments of approximately $105 per month, which he sent to his sister. He did not designate any of that money as support for his children. It should also be noted that he did not voluntarily pay child support when he was in prison; it was only after he was contacted by child support enforcement authorities that the $5 per month child support was paid. K.S.A. 2008 Supp. 59-2136(d) states: "In determining whether a father's consent is required under this subsection, the court may disregard incidental visitations, contacts, communications or contributions." Father's payments can only be considered incidental because they were not voluntary; he had other assets that could have been used to support his children, and he chose not to do that. The district court was not in error in finding that Father had not financially provided substantial support to his children during the 2 years preceding the filing of Stepfather's petition for adoption.

Since L.H.D.'s death, K.D. and J.D. have been in therapy to help them deal with this issue. Dr. James L. Vincent has treated both children. He testified that K.D. experienced migraine head-

aches and sleep disruptions, and he diagnosed her with a generalized anxiety disorder with mild depression. Also, "she has a conflict of loyalties regarding whether or not, you know, can she love her father even though her father, you know, killed her younger sister." He stated that K.D. does not want to visit her father in prison. When she started in therapy, K.D. was emotionally and therapeutically rated a 2 or 3 on a scale of 10, with 1 being "bad" and 10 being "the best." She is now rated a 7 or an 8; however, she "continues to have unresolved issues related to the murder of her younger sister and her father who was sent to jail." Dr. Vincent also testified that the children have fears that Father may harm them when he gets out of prison. His treatment notes stated that "[K.D.] stated that she is happy about being adopted and stated that she worries that her biological father . . . will get out of jail and 'kill her.' "

Dr. Vincent testified that J.D. has a history of cancer "which means that he is vulnerable to depression and anxiety in the first place." J.D. was 6 years old when L.H.D. was killed, and he was present when Father abused L.H.D. He felt he could have stopped it from happening and as a result has posttraumatic stress disorder. J.D. also has trichotillomania, wherein he habitually pulls out his eyelashes. According to Dr. Vincent, J.D. has a lot of the same issues as K.D. Dr. Vincent testified that it was in K.D.'s and J.D.'s best interests to be adopted by Stepfather. He also testified that if the adoption is not granted, both children are likely to have more emotional problems in the future.

There is a great deal of testimony in the record on appeal about the positive relationship these children have with their stepfather and, by the same token, evidence of the unfitness of their biological father.

The district court made all the required findings of fact and conclusions of law, and I would affirm Stepfather's adoption.

With regard to attorney fees, the majority find that the appellee in this case should pay $3,941.76 in attorney fees and $133.76 in costs toward Father's attorney fees and costs. I disagree. Here, appellee offered to pay fees for Father's appointed trial counsel at the trial court level after the court granted the adoption. That

agreement was incorporated in the journal entry. Appellee never agreed to pay Father's costs and fees for the appeal.

The majority ignores the fact that the decision at the district court level was in favor of the appellee (plaintiff). It was Father who brought this appeal. There are genuine issues raised in this appeal that has caused a split decision. In such a case, the parties should each bear their own costs and fees.

According to Kansas Supreme Court Rule 7.07 (2008 Kan. Ct. R. Annot. 60), the decision of whether to grant appellate fees and costs is discretionary with this court. Because I have dissented from the majority ruling regarding the adoption, I also believe that for all the reasons stated above, appellee should not be ordered to pay Father's attorney fees and costs.

I would deny all requests by Father for attorney fees and costs and affirm the district court.