(209 P.3d 200)
No. 100,823

IN THE MATTER OF THE ADOPTION OF B.J.M., A MINOR CHILD

—

Opinion filed June 5, 2009.

*Britt Colle,* of McPherson, for appellant natural father.

*Amy Coppola* and *Lowell C. Paul*, of Kansas Legal Services, for appellee adoptive stepfather.

Before RULON, C.J., GREENE and STANDRIDGE, JJ.

STANDRIDGE, J.: In this stepparent adoption case, the biological father (Father) appeals a district court order permitting his child, B.J.M., to be adopted without his consent. First, Father alleges he was denied his constitutional right to due process when the district court refused to allow him to be personally present at the adoption hearing. Second, Father alleges there was insufficient evidence to support the district court's decision to grant the adoption without his consent. For the reasons stated below, we reverse and remand.

### *Facts*

After marrying K.D.B. (Mother), C.K.B. (Stepfather) filed a petition to adopt her biological son B.J.M. (the child). The child's biological father, T.L.M. (Father), an inmate at the Hutchinson Correctional Facility, objected to the adoption.

According to Father, Stepfather and Mother continually interfered with his relationship with the child by refusing to place the child on Father's approved visitation list and by disrupting any and all communication between Father and the child. In support of these assertions, Father attached a letter sent to him by Mother, which he characterized as a "form of blackmail." The letter stated, in relevant part:

"Before [the child] could ever come see you I would want you to sign the Adoption papers for [Stepfather] to Adopt [the child], I would consider bring [*sic*] [the child] for A visit if you do this. I know you want the Best for [the child].and I think that having the same last name of his Brothers would be A good start! If you would do this for [the child] I would make sure to send you pictures of [the child] growing up!"

The district court scheduled a hearing on Stepfather's adoption petition for June 2, 2008, which Father did not attend. At the start of the hearing, over which District Judge John Weckel presided, Father's appointed counsel described her attempt to secure Father's presence at the proceeding:

"MS. BAUER: Yes, Your Honor. For the purposes of the record, I just need to point out that obviously [Father] is not present today. [Father] is incarcerated

at the Hutchinson Correctional Facility. I spoke with Judge Anderson approxi-ımately a week ago and had ask [*sic*] that he be transported for today's hearing and Judge Anderson stated that the Court would not be doing that. So I would like the record to reflect that I requested for [Father] to be here but the Court refused to transport him to this hearing today."

When asked by the district court whether a written motion requesting transport had been filed, Father's appointed counsel explained she had not done so in light of Judge Carl Anderson's verbal denial. Counsel informed the judge that she was willing to move for a continuance of the hearing in order to submit a written request for her client to appear at the proceedings "if that would make any difference." The district court stated it was "just trying to get the picture clear of what has happened," and permitted the trial to proceed in Father's absence.

At the hearing, Mother testified she was pregnant in September 2004 when Father moved out of the home and failed to return. According to Mother, Father neglected to provide any care or financial help during the pregnancy. In December 2004, Mother experienced preterm labor and gave birth to the child 24 weeks before her due date. After being notified by Mother that the child would be premature, Father arrived at the hospital for the birth and reportedly stayed for a couple of hours before leaving.

Mother recounted that after the child was born Father saw the child 10 to 12 times, with the last contact occurring in 2005. These visits reportedly took place at a friend's house or when Father stopped by Mother's home for the purpose of retrieving items from a shed. Mother also testified that following Father's incarceration in 2006, Father never placed a telephone call to the child or provided her with financial support, although Mother also admitted she never obtained a child support order against Father. According to Mother, Father's contact with the child during the 2 years preceding the adoption petition consisted of just one letter. Mother admitted Father sent correspondence to her and Stepfather requesting the child be brought to the prison for a visit but stated that Father failed to send her the necessary forms authorizing visitation.

With respect to the letter in which she stated she would never let the child visit the prison unless Father consented to the adoption, Mother stated the purpose "wasn't blackmail." Mother explained:

"A. . . . [I]t, it wasn't to persuade him, it was trying to get him to come around.
"Q. Come around to what?
"A. Maybe to let [the child] be with us more. *To allow the adoption.* That we wouldn't take [the child] from him, you know, we would still give him the pictures, and everything, to, no matter what had happened we would still stay in contact." (Emphasis added.)

Stepfather also testified. His testimony corroborated Mother's statements regarding Father's limited contact with the child, Father's failure to provide any financial support to Mother, and Father's failure to develop a relationship with the child. Stepfather also confirmed that neither he nor Mother ever took the child to the prison to see Father.

Once Stepfather finished presenting his evidence, Father's appointed counsel sought to admit an affidavit prepared by Father in lieu of his testimony. After Stepfather objected on the basis that the affidavit contained statements not subject to cross-examination and which had not been proven, the district court denied counsel's request to admit the affidavit into evidence but assured Father it would consider the statements contained in his answer to Stepfather's petition when rendering its decision.

The district court ultimately granted Stepfather's adoption petition, finding Father's consent was unnecessary since Father had failed to assume his parental duties in the 2 years preceding the filing of Stepfather's adoption petition. In addition, the district court found that Father was an unfit parent.

### *Analysis*

Father alleges he was denied his constitutional right to due process when the district court refused to allow him to be personally present at a hearing that was held to determine whether Father's parental rights should be permanently terminated without his consent. Before reaching the substance of Father's allegation, we first

consider Stepfather's argument that Father failed to preserve this issue for appellate review by raising it for the first time on appeal.

The week before the scheduled adoption hearing, Father's counsel orally requested an order permitting Father to be transported to court from the Hutchinson Correctional Facility so that Father could personally be present for the proceeding. Judge Anderson orally denied counsel's request. At the adoption hearing before Judge Weckel the next week, counsel made a record regarding Judge Anderson's refusal to grant her request for Father to appear in person. After acknowledging counsel's efforts to have Father personally appear, Judge Weckel permitted the adoption hearing to proceed in Father's absence.

Based on these facts, we find sufficient evidence to establish that counsel requested that the district court permit Father to appear in person at the adoption hearing and that the district court denied the request. First, we find counsel's opposition to Judge Anderson's decision, made on the record in front of opposing counsel at trial, is analogous to a continuing objection. Moreover, Judge Weckel's decision to proceed without Father demonstrates that Judge Weckel embraced Judge Anderson's decision to deny Father's request to be personally present at the adoption hearing. For these reasons, we deem the issue properly raised and now move on to the merits of Father's due process argument.

The basic elements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner. Whether an individual's due process rights were violated is a question of law subject to de novo review. *In re J.D.*, 31 Kan. App. 2d 658, 666, 70 P.3d 700 (2003).

In reviewing a procedural due process claim, the court first must determine whether a protected liberty or property interest is involved. *Winston v. Kansas Dept. of SRS*, 274 Kan. 396, 409, 49 P.3d 1274, *cert. denied* 537 U.S. 1088 (2002). To that end, a parent's right to make decisions regarding the care, custody, and control of his or her child qualifies as a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution. *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007).

Therefore, we find the first step in Father's procedural due process claim has been met.

The next step in analyzing a procedural due process claim requires us to examine the nature and extent of the process due. Rather than a fixed concept, due process is flexible and calls for such procedural protections as the particular situation demands. *In re Habeas Corpus Application of Pierpoint*, 271 Kan. 620, 627, 24 P.3d 128 (2001). A recent decision applying this flexible approach to due process is *In re Adoption of J.M.D.*, 41 Kan. App. 2d 157, 202 P.3d 27 (2009) (*pet. for review* granted June 4, 2009). In that case, the father, an inmate in Missouri, sought to continue a stepparent adoption proceeding until he was released from prison. The father argued he had a right to be personally present at a hearing where the issue presented for determination was whether a petition for adoption filed by his children's stepfather should be granted without his consent. The district court refused to grant the continuance and a panel of our court affirmed. 41 Kan. App. 2d at 170-71.

In support of the decision to affirm, our court found the stepfather diligently attempted to obtain the father's presence at the hearing by taking "every reasonable action," including filing a habeas corpus petition with Missouri authorities. *In re Adoption of J.M.D.*, 41 Kan. App. 2d at 171. When that attempt failed, the father was permitted to proceed via telephone, through which he heard all the testimony and testified on his own behalf. In addition, the district court allowed the father several breaks in which everyone except the father's attorney left the courtroom so the two could consult about the process of the hearing. Under these circumstances, the court concluded that the father's due process rights were protected because he was afforded "both notice and an opportunity to be heard at a meaningful time and in a meaningful manner." 41 Kan. App. 2d at 171.

In a similar context, our court also has held an imprisoned father has a due process right to be personally present at a hearing where termination of parental rights, as opposed to a stepparent adoption, was the issue presented for decision. *In re S.M.*, 12 Kan. App. 2d

255, 256-57, 738 P.2d 883 (1987). In *In re S.M.*, the district court denied the imprisoned father's motion to be released from prison so that he could be present at a proceeding brought by the State to sever his parental rights. On appeal, a panel of our court reversed the decision to terminate the father's parental rights on grounds that the termination was accomplished in a proceeding that violated the father's right to due process. Our court ruled that the father's interest in the care and custody of his child "far outweigh[ed] the State's interest in summary adjudication." 12 Kan. App. 2d at 256. Although the father had been represented by counsel at the severance hearing, the court nevertheless held that he was denied the opportunity to be heard because he was unable to present any of his testimony in defense of the allegations of unfitness. The court further noted that "a recognized benefit of an interested party's presence in court is his ability to assist his counsel," and that "[t]his too, arguably, inured to [the father's] disadvantage." 12 Kan. App. 2d at 257.

Although a different conclusion was reached, the court's analysis 3 years later in *In re J.L.D.*, is entirely consistent with both *S.M.* and *J.M.D. In re J.L.D.*, 14 Kan. App. 2d 487, 490-91, 794 P.2d 319 (1990). In *J.L.D.*, a panel of our court upheld a district court's decision to terminate an imprisoned father's rights, even though the father could not personally attend the hearing. 14 Kan. App. 2d at 491. Although the *J.L.D.* court stated its intention to narrow the holding in *In re S.M.*, the court erroneously interpreted the *S.M.* court to have broadly conferred upon each natural parent an unconditional and "absolute right to be present at a severance hearing without regard to the particular circumstances in the individual case." *In re J.L.D.*, 14 Kan. App. 2d at 490.

The *J.L.D.* court then went on, as did the *S.M.* and *J.M.D.* courts, to consider the particular circumstances presented in its case. The court noted that diligent attempts had been made by father's counsel to transport father from Florida and secure his personal presence in court; however, these efforts were unsuccessful. The court also considered that the father would be serving an extended term in prison. While recognizing that the loss of parental rights was "extremely important," the court found that, *under the specific*

*facts presented*, the loss of parental rights was outweighed by "the loss by the child of the right to a prompt judicial determination of his status." *In re J.L.D.*, 14 Kan. App. 2d at 491. Accordingly, the court rejected the father's due process claim and affirmed the district court's decision. 14 Kan. App. 2d at 491.

Simply put, we find indistinguishable the due process analysis utilized by the courts in *S.M.*, *J.L.D.*, and *J.M.D.* in determining whether an imprisoned father is entitled to be personally present at a hearing where termination of parental rights was the issue presented for decision. In each case, the court readily conformed to the rule in Kansas that due process is flexible and calls for such procedural protections as the particular situation demands.

With this rule in mind, we now turn to whether due process required the district court to transport Father to the stepparent adoption proceeding under the circumstances of this particular case. To accomplish this task, we apply the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976). This test requires us to weigh the following factors: (1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the State's interest in the procedures used, including the fiscal and administrative burdens that the additional or substitute procedures would entail. *Winston*, 274 Kan. at 409-10.

With regard to the first factor, we already have determined Father has a fundamental liberty interest in the care, custody, and control of his child. See *In re J.D.C.*, 284 Kan. at 166. This interest "is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]." *Troxel v. Granville*, 530 U.S. 57, 65, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000). Given the primary issue presented for determination at the adoption hearing was Father's constitutional right to the care, custody, and control of his child, the adoption proceeding instituted by Stepfather squarely threatened Father's asserted liberty interest in parenting his biological child. This first factor weighs in favor of a finding that Father's due process rights were violated in failing to transport him to the adoption hearing.

With Father's individual interests identified, we move on to evaluate the risk of erroneous deprivation of these interests through the procedures used and the probable value, if any, of additional or substitute procedural safeguards. See *Winston*, 274 Kan. at 409. Here, the district court summarily denied Father's request to be present at the adoption hearing. And, because the court denied Father the opportunity to introduce into evidence an affidavit setting forth Father's sworn statements, no substitute measures were utilized to ensure that Father had an opportunity to be heard at a meaningful time and in a meaningful manner. Thus, for purposes of this second factor, our only task is to evaluate the risk that Father was unlawfully deprived of a fundamental liberty interest when prohibited from personally attending the adoption hearing.

To that end, we find great risk that Father was unlawfully deprived of a fundamental liberty interest when prohibited from personally attending the adoption hearing, especially given the complete absence of any substitute measures to ensure that Father had an opportunity to be heard at a meaningful time and in a meaningful manner. As a preliminary matter, Father was wholly deprived of the opportunity to testify—whether in person, by deposition, or by affidavit—regarding the efforts he made to assume his parental duties in the 2 years preceding the filing of Stepfather's adoption petition, as well as the actions taken by Mother and Stepfather to obstruct these efforts.

Moreover, Father was deprived of the opportunity to review, and subsequently challenge, the testimony of and the evidence introduced by Stepfather and Mother at the hearing. This is extraordinarily significant because, although Father's counsel had the procedural ability to cross-examine witnesses and challenge evidence on behalf of Father, Father's inability to assist counsel with regard to these matters greatly diminished the efficacy of his counsel's cross-examination. Given his personal history with Mother, Father was familiar with Mother's traits, propensities, and demeanor, which would have assisted counsel in cross-examination as to Mother's recollection, veracity, and communication skills. Simply put, we find great risk that Father was unlawfully deprived of a fundamental liberty interest when prohibited from personally

attending the adoption hearing. As such, this second factor also weighs in favor of a finding that Father's due process rights were violated in failing to transport him to the adoption hearing.

The third and final *Mathews* step is to weigh the government's interest in the procedures used, including the fiscal and administrative burdens that additional or substitute procedures would entail. See *Winston*, 274 Kan. at 409-10. With regard to Father's request to be transported to the stepparent adoption proceeding, governmental interests include the expense of Father's transportation and safekeeping and any potential danger or security risk which the presence of Father would pose. See 15 Am. Jur. 2d, Civil Rights § 158, p. 370. As for security concerns, nothing in the record establishes Father's presence at the stepparent adoption proceeding posed any unique risk beyond those normally presented when a prisoner is transported for a hearing. According to Father, he is incarcerated on drug convictions, not for violent offenses against a person or other destructive behavior. Stepfather does not dispute this claim.

Regarding the expense to the government of transporting Father and providing for his safekeeping, there is no evidence in the record of cost to the government that compliance with Father's request would have entailed. Nevertheless, common sense suggests that the burden on the State would not have been prohibitive.

First, most, if not all, county jails and trial courts likely are accustomed to receiving and providing for custody of persons incarcerated for drug offenses. Second, the Hutchinson Correctional Facility is located in Hutchinson, Kansas, and the McPherson County District Court—where the stepparent adoption proceeding occurred—is located in McPherson, Kansas. See K.S.A. 60-409(b)(4) (stating that judicial notice may be taken of specific facts capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy); K.S.A. 60-412(c) (stating that reviewing court in its discretion may take judicial notice of any matter specified in K.S.A. 60-409 whether or not judicially noticed by district court). For these reasons, we find Father's fundamental right to the care, custody, and control of his child and his interest in personally attending the adoption hearing were un-

matched by any governmental interests at stake; thus, the third *Mathews* factor weighs in favor of a finding that Father's due process rights were violated in failing to transport him to the adoption hearing.

Based on the discussion above, we find Father's due process rights were violated when he was deprived of an opportunity to be heard at a meaningful time and in a meaningful manner with regard the adoption of the child without his consent. Since we have found a constitutional violation, the next question is whether Father is entitled to a reversal of the district court's ruling and remand for a retrial. To that end, there are two types of constitutional error: trial error, which is subject to the constitutional harmless error test found in *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967), and structural error, which is automatically reversible. See *State v. Calderon*, 270 Kan. 241, 250, 13 P.3d 871 (2000) (citing *Arizona v. Fulminante*, 499 U.S. 279, 113 L. Ed. 2d 302, 111 S. Ct. 1246 [1991]).

A distinguishing feature of trial errors is that they occur during the presentation of the case to the factfinder and are therefore able to be quantitatively assessed in the context of the evidence to determine whether the error was harmless beyond a reasonable doubt. See *Calderon*, 270 Kan. at 250. Structural error, in contrast, leads to consequences that are " 'necessarily unquantifiable and indeterminate.' " *Calderon*, 270 Kan. at 253 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 281-82, 124 L. Ed. 2d 182, 113 S. Ct. 2078 [1993]).

Here, the consequences of the district court's error included depriving Father of the opportunity to testify regarding the efforts he made to assume his parental duties in the 2 years preceding the filing of Stepfather's adoption petition, as well as the actions taken by Mother and Stepfather to obstruct these efforts. Further consequences include depriving Father of the opportunity to review, and subsequently challenge, the testimony of and the evidence introduced by Stepfather and Mother at the hearing. For these reasons, the district court's error here is not one that easily can be quantitatively assessed in the context of the evidence to determine harmlessness beyond a reasonable doubt. Instead, we find the mea-

sure of prejudice caused by this error is necessarily unquantifiable and indeterminate. See *Calderon*, 270 Kan. at 250. Thus, the due process error was structural and Father is entitled to automatic reversal.

Finally, we find it necessary to address briefly Father's second issue on appeal: whether the evidence presented at trial was sufficient to support the district court's decision to grant the adoption without Father's consent. While the evidence presented at the adoption hearing, if left unchallenged, might have been sufficient to terminate, we cannot ignore the overriding reality that Father was denied due process with regard to that hearing. Given the impact that Father's absence had on evidence that was introduced and excluded at the hearing, it is difficult, if not impossible, to fairly assess whether there was sufficient evidence to support the court's decision to grant the adoption without Father's consent.

We reverse the district court's decision to grant Stepfather's petition for adoption and remand for a new hearing that fully complies with Father's due process rights.

Reversed and remanded.