No. 123,618

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of C.T.,
A Minor Child.

SYLLABUS BY THE COURT

A district court conducting child in need of care proceedings by videoconference, including a hearing on a motion to terminate parental rights, does not violate the due process rights of the participants so long as certain safeguards are present. These safeguards include adequate audio quality which allows all participants to hear the proceedings, the ability of participants to observe the witnesses, the ability of parties to access all exhibits, and the ability of parties to confer privately with their attorneys.

Appeal from Miami District Court; AMY L. HARTH, judge. Opinion filed October 29, 2021. Affirmed.

*Richard M. Fisher, Jr.*, of Richard M. Fisher, Jr. LLC, of Osawatomie, for appellant natural mother.

*Elizabeth H. Sweeney-Reeder*, assistant county attorney, and *Steven M. Ellis*, guardian ad litem, for appellee.

Before ARNOLD-BURGER, C.J., SCHROEDER, J., and WALKER, S.J.

WALKER, J.:  This is an appeal by Mother from the district court's termination of parental rights to her son, C.T. The State filed a child in need of care (CINC) petition and motion for finding unfitness and termination of parental rights or appointment of a permanent custodian. The district court adjudicated C.T. to be a child in need of care and ultimately terminated Mother's parental rights and ordered C.T. placed for adoption. Mother appeals, arguing that the district court's findings were not supported by clear and

1

convincing evidence, the court abused its discretion, and a videoconference evidentiary hearing denied her due process rights. Because we conclude the district court did not err and videoconferencing does not violate due process rights so long as adequate safeguards are present, we affirm.

FACTS

The Kansas Department for Children and Families (DCF) removed four-year-old C.T. from his father's home in March 2018. After the State filed a CINC petition, the district court immediately entered an ex parte order of protective custody, scheduling a hearing for the next day. After the hearing, the district court found probable cause to believe that the allegations in the State's petition were true and granted an order for temporary custody with DCF.

After a hearing in July 2018, the district court adjudicated C.T. to be a child in need of care under K.S.A. 2018 Supp. 38-2202(d)(1). The State and guardian ad litem subsequently moved to terminate parental rights in February 2020. The district court held a two-day evidentiary hearing on terminating parental rights on October 27-28, 2020.

The day before the parental rights termination hearing, the district court heard Mother's motion to require an in-person hearing. Mother argued that proceeding by videoconference deprived her of due process. The district court confirmed that Mother had access to all exhibits and that Mother could consult with her attorney privately through the videoconference software. It also noted that under Supreme Court administrative orders, everyone appearing in person would have to wear masks. The district court stated the masks obscure facial expressions, which affects judging witness credibility. The court denied Mother's motion, ruling that proceeding by videoconference would not violate Mother's due process rights.

The State called Karen Hansen, the first case manager for C.T. Hansen testified about two case plans which Mother needed to follow. The first case plan required Mother to maintain a stable home and stable income, complete a budget, complete drug and alcohol assessments and a mental health intake and follow their recommendations, complete an approved parenting class, and submit to urinalysis (UA) testing, with a requirement of two consecutive clean UAs before Mother's visitations with C.T. The second case plan was substantially the same.

Hansen testified that Mother participated in UA testing consistently for several months before she stopped taking the tests, which halted her visitations. The case plan required Mother to have a safe and stable home. Because Mother lived in Missouri, Hansen needed her to complete an interstate compact form to allow C.T. to be placed there. But Mother never completed the form because she lived with her stepfather, and he would not provide his information. Because the interstate compact paperwork was never completed, no home visit could ever be conducted in Missouri to determine whether the home was safe and stable.

Hansen testified that Mother did not ask for help when she had car problems, did not ask for help in completing the interstate compact form, and did not lack understanding of the case plan. Mother did not try to move from her stepfather's house even though he was the obstacle to completing the interstate compact form. Mother missed UAs without notification that she could not make it; she was a no call, no show. Hansen also testified that Mother missed visits with C.T., recalling that one was a no call, no show because of Mother oversleeping.

Kyra Gabel also testified that she helped schedule and facilitate the case plan. Gabel provided Mother with a parent stress index assessment and a child stress index assessment. Gabel offered to complete the assessments with Mother immediately, but she

3

opted to take the assessments home and complete them later. Gabel testified that Mother never returned completed assessments to her.

Wendy Dodd supervised the case managers on C.T.'s case and managed the case herself during the summer of 2019. Dodd testified that she helped Mother get her driver's license. Dodd confirmed that Mother missed visits with C.T., some of which involved transportation problems, but some of which were no call, no show. Dodd talked with Mother about the interstate compact process, stressing that it needed to be completed so that C.T. could go to her home. Dodd had no concerns about Mother's employment as a waitress/server in Missouri but talked to her about potentially changing her work hours to be able to supervise C.T. Dodd never saw Mother show a lack of understanding about what was required of her under the case plan or what was needed to complete the interstate compact requirements.

Jessica Kingsolver, a family support worker, testified that she assisted the case manager with visits, meetings with parents, and record requests. Kingsolver spoke with Mother about the interstate compact. Mother had moved away from her stepfather by this point and was living with a roommate, but the roommate had not completed her portion of the interstate compact.

Rebecca Roehl worked as a case manager on C.T.'s case. Roehl testified that she was never able to determine whether Mother maintained a stable, clean, and safe home. Roehl explained that Missouri denied the interstate compact request because Mother's roommate did not comply and provide necessary information required by the compact. When Roehl asked Mother why not, Mother said that her roommate indicated that she had better things to do. Roehl discussed the option of moving elsewhere so that Mother could complete the home visit requirement for reuniting with C.T. But Mother told Roehl that she did not have enough time to move and establish residency for the interstate compact.

Roehl testified that Mother understood how important it was to complete the interstate compact and the home visit. Roehl asked Mother if she talked to her roommate about the interstate compact. Mother said that she had not but that her roommate would just have to do it. Roehl and Mother discussed other housing options, but it was unclear if those options were viable.

Roehl also testified that she had concerns about Mother affording a place of her own. On the last budget Mother completed, she reported earning approximately $1,500 per month, but her bills and her part of the rent totaled approximately $1,100 per month. And if Mother paid the child support for her older son that did not live with her, that would leave approximately $100, not including support for C.T. Mother told Roehl that if she rented her own place, then her rent would go from $300 to $650 per month. Roehl did not know if Mother had ever taken any steps to move out from the home she shared with her roommate.

Roehl also discussed the stable income requirement of the case plan with Mother. They talked about how she worked nights as a bartender at three different bars and how her hours could affect her time with C.T. Mother told Roehl that a friend or friends or her mom could watch C.T. But Mother was unsure where C.T. would be supervised, by whom, and where he would sleep every night. Roehl asked Mother if she considered finding a daytime job to alleviate the problem of who would supervise C.T. in the evening. Roehl did not tell Mother to quit her job but reviewed possible options for changing either her schedule or her child supervision plans to care for C.T.

Mother completed a drug and alcohol assessment but did not comply with its recommendations. Mother initially followed a recommendation for individual therapy but later said that she did not need any treatment.

5

Roehl testified that Mother complied with other case plan tasks including completing an approved parenting class, signing releases, maintaining stable transportation, and completing a parental assessment. Mother never told Roehl that she did not understand parts of the case plan and interstate compact. Mother also did not request help with completing tasks.

Roehl also testified that Mother missed eight visits with C.T. According to Roehl, Mother was a no call, no show for one visit with C.T., leading to C.T. sitting and waiting in the office for 20 minutes while caseworkers tried to contact Mother. And Mother canceled three other visits before the district court implemented a 24-hour notice policy. After that, four more visits were canceled because Mother did not confirm 24 hours prior to the scheduled visit.

K.M. testified that she had been the foster parent for C.T. since May 2018. K.M. noted that C.T. does not usually bring up or talk about Mother unless it is a day Mother is scheduled to visit. C.T. is disappointed and upset when a visit is canceled. C.T. sometimes called K.M. "mom" and referred to other foster children in the home as "my sister" or "my brother."

Mother testified that she understood all aspects of the case plan and the interstate compact. But Mother also admitted she failed to complete the interstate compact requirements before the deadline. After Mother moved into a new home, she again failed to complete the interstate compact requirements before the deadline. Mother testified that she could not get her roommate to complete her part of the paperwork.

Mother testified she knew that it was important to have a day job so that she could spend time with and do things with C.T. Mother continued working as a bartender while "keeping an eye out" for a day job she could enjoy. As of the termination hearing, Mother had not searched for jobs through the internet, newspapers, or an employment office.

Mother was working five or six nights per week and could not specify how much childcare would cost if C.T. was returned to her.

Mother testified that, while this case was pending, she pled guilty to driving under the influence and "[p]ossession" in Cass County, Missouri, and was placed on probation. Mother got a valid driver's license back in February 2020. Mother has another son but does not exercise her visitation rights with him. Mother testified about several canceled visits with C.T. that she did not confirm 24 hours in advance because it slipped her mind when she was busy at work.

At the close of evidence, the district court took the matter under advisement. The court announced its ruling at a separate hearing the next week. The court recognized that Mother had been engaged in the process outlined in the case plans, had completed many of her approved case plan tasks, and had maintained contact with C.T. through visitation. "On their face, these facts might suggest the mother should be found fit; however, several key pieces of evidence clearly convince me otherwise."

First, the district court was concerned that Mother never provided proof of a safe, stable home for C.T. by cooperation with the interstate compact process. Second, the court discussed the issue of Mother's working nights in conjunction with C.T.'s care. Two possible solutions were for Mother to either find someone to supervise C.T. at night while Mother worked, or for Mother to find a day job. The court was concerned that Mother had made no progress in either finding other employment or addressing who would care for C.T. during her working hours. Third, the court was concerned that Mother could see her older son but does not do so, with no explanation about why it was not a priority. Finally, the court observed that Mother was uninterested in therapy and was unwilling or unable to come up with a treatment goal. The district court found that these factors weighed against Mother but addressed one more factor which was inconclusive. The court found that Mother made most of her visits but missed some, declining to weigh this

7

factor because "the only person who is qualified to answer the question of how many missed visits is too many is that little boy."

The district court found Mother unfit under K.S.A. 2020 Supp. 38-2269(b)(8) for lack of effort to adjust her circumstances, conduct, or conditions to meet C.T.'s needs. The court stated that Mother had two and a half years (1) to show a safe, stable home and (2) to adjust either her work schedule or childcare plans so that C.T. would be supervised. The court found that Mother failed to do either.

Having found Mother unfit, the district court then turned to whether termination of parental rights was in C.T.'s best interests. As an aside, the court noted that the length of the case exceeded the presumption of unfitness benchmarks in K.S.A. 2020 Supp. 38-2271(a)(5)-(6), although the district court expressly did not use this factor in its decision. Instead, the court focused on Mother's capacity to change to meet C.T.'s needs, ruling:

> "Roehl testified that [C.T.] and his mother love each other, but when asked by Mr. [Steven] Ellis, the guardian ad litem, why her rights should not be terminated, the mother's response was quote, 'because I love that kid and he loves me,' end quote. Nothing about what [C.T.] might need, what she has done to provide for those needs, or how she might meet those needs under her current circumstances.
>
> "She demonstrated no willingness and took no action to change her schedule to meet his needs and took no statement—made no statement of responsibility or willingness to sacrifice to meet [C.T.'s] needs.
>
> "I do not doubt [Mother's] love for her son or his for her. But taken as a whole, it is clear that she cannot meet his physical or emotional needs, and shows no signs of changing that. [C.T.] is a six year old boy whose emotional, mental and physical needs require a parent who will put him first, and spend her available time parenting him. Something I point out she has failed to do with [her older son], although by her own admission there is no barrier to her doing so.
>
> "He needs a parent who will put his needs above her own, which sometimes includes doing things whether you think you need to or not. Despite completing many of

8

her case plan tasks, [Mother's] actions over the last two years have demonstrated she is not in a position or is not willing to do those things."

After making these findings, the district court ordered Mother's parental rights to C.T. be terminated.

Mother has timely appealed from the district court's termination order.

ANALYSIS

*Clear and convincing evidence supports the district court's unfitness finding.*

On appeal, Mother first argues that the district court's finding that she was unfit was unsupported by clear and convincing evidence because Mother completed most of the case plan tasks. In response, the State contends that Mother's failure to show a safe and stable home for C.T., her unsuccessful discharge from therapy, and her inability to reconcile her work hours with C.T.'s care were failures of key tasks which support the district court's finding that Mother was unfit. After careful review, we conclude the evidence supports the district court's finding.

"When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a).

When an appellate court reviews a district court's termination of parental rights, it should "'consider whether, after review of all the evidence, viewed in the light most favorable to the State,'" it is "'convinced that a rational factfinder could have found it

9

highly probable, *i.e.*, by clear and convincing evidence, that the parents' right should be terminated.'" *In re K.H.*, 56 Kan. App. 2d 1135, 1139, 444 P.3d 354 (2019).

In reviewing a district court's decision based on any clear and convincing evidence standard, an "appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

The district court found that Mother was unfit under K.S.A. 2020 Supp. 38-2269(b)(8) and (c)(3), which state:

> "(b) In making a determination of unfitness the court shall consider, but is not limited to, the following, if applicable:
>
> . . . .
>
> (8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child; . . .
>
> . . . .
>
> "(c) In addition to the foregoing, when a child is not in the physical custody of a parent, the court, shall consider, but is not limited to, the following:
>
> . . . .
>
> (3) failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

Mother's argument here fails simply because she is asking us to reweigh the evidence. She notes that she completed many of the tasks in the case plan, including providing UAs, maintaining employment, completing parenting classes, and attending most of her visits with C.T. But the district court acknowledged these facts and weighed them against her failure to successfully complete individual therapy and her failure to establish a safe and stable home. The district court also factored in Mother's inability to solve the problem of C.T.'s supervision while she was at work. Mother does not assert

10

that any of the facts that the district court relied on were erroneous. Mother also does not cite authority to support her position. Viewing the evidence in the light most favorable to the State, the district court's consideration of all the evidence showed that a rational fact-finder could have found it highly probable that Mother was unfit for the reasons the court cited.

Mother also argues that the district court's finding that the reasonable efforts of appropriate public or private agencies failed to rehabilitate the family was also unsupported by clear and convincing evidence. Mother cites no legal support for her position. She also does not assert that the court made a factual error or misstated the evidence. Instead, Mother invites this court to reweigh the evidence. Once again, this is something we cannot do.

Mother does not contest the district court's finding that her unfitness was unlikely to change in the foreseeable future. However, the district court thoroughly addressed this issue, finding the child has been in out of home placement for over two years, and during that entire period, Mother has demonstrated little or no motivation to change her conduct to meet the needs of the child, and there was "no evidence . . . that suggests [Mother's] conduct will change in the foreseeable future." The best indicator of future performance is past performance. Accordingly, courts can consider a parent's past conduct as evidence regarding the reasonable likelihood of any future change in parental fitness. See *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 994 (2019); *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). As a result, we find that the district court's conclusion regarding Mother's future unfitness is also supported by clear and convincing evidence.

11

*The district court did not abuse its discretion in finding that termination of Mother's parental rights was in the best interests of C.T.*

Mother next argues that the district court abused its discretion because it terminated Mother's parental rights without making the necessary findings under Kansas law. The State responds that the facts underlying the finding that Mother was unfit also supported the finding that termination was in C.T.'s best interests.

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2020 Supp. 38-2269(g)(1). In making such a decision, the court must give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2020 Supp. 38-2269(g)(1). This decision is within the sound discretion of the district court, which makes that decision based on a preponderance of the evidence. *In re M.S.*, 56 Kan. App. 2d at 1264.

We review the district court's decision for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). A court exceeds its broad latitude if its ruling stems from an error of law or fact or is "arbitrary, fanciful, or unreasonable." *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

Mother argues that the district court made insufficient and inaccurate findings of fact: "The only finding the Court made was that it was in the child's best interest[s], specifically that the parental rights be severed based upon the evidence presented by the State that the natural mother did not have a residence which she did and her not having day-time employment."

Mother misstates the district court's ruling because her claim about the day job is inaccurate and the claim about residence is false. The district court's chief concern was that Mother did not have childcare for C.T. when she was working. This issue could have been solved by finding care during those working hours or by changing her hours. The district court did not require her to find a day job. And the district court never found that Mother lacked a residence but rather found that she never completed the interstate compact process to allow a home care visit for verification that her residence was safe and stable for C.T. Instead, the court found that Mother made no statement of responsibility or willingness to meet C.T.'s needs, that under her current circumstances she could not meet his needs, and there were no signs that was likely to change.

Mother does not allege an error of law or that the district court's ruling was "arbitrary, fanciful, or unreasonable." *Northern Natural Gas Co.*, 296 Kan. at 935. Mother's claims of factual error are, in reality, not error. We find that the district court did not abuse its discretion in terminating Mother's parental rights.

*The district court did not violate Mother's due process rights by holding the evidentiary hearing on the motion to terminate her parental rights by videoconference.*

As her final argument on appeal, Mother complains that the district court denied her due process rights by holding the termination of parental rights hearing by videoconference. The State counters that the district court correctly determined that Mother failed to show a due process violation. Because K.S.A. 20-347 allows the chief judge in each district to hold court in alternative locations, and in light of the procedural safeguards employed by the district court here, we conclude that the district court properly conducted the hearing by videoconference.

When evaluating a due process claim, appellate courts first determine whether a fundamental liberty or property interest is implicated. If so, the court determines the

13

nature and extent of process that is due. *In re J.L.*, 57 Kan. App. 2d 60, 64, 449 P.3d 762 (2019). "Whether an individual's due process rights were violated is a question of law subject to de novo review." *In re Adoption of B.J.M.*, 42 Kan. App. 2d 77, 81, 209 P.3d 200 (2009).

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the care, custody, and control of the child, the parent is entitled to due process of law. *In re Adoption of A.A.T.*, 287 Kan. 590, 600-01, 196 P.3d 1180 (2008); see also *In re X.D.*, 51 Kan. App. 2d 71, 73-74, 340 P.3d 1230 (2014) (right to be legal parent of child is fundamental right).

The State notes that whether a videoconference hearing violates due process is a case of first impression in Kansas. In support of its position that videoconferencing does not pose a due process violation, the State cites authority from Massachusetts.

In *Vazquez Diaz v. Commonwealth*, 487 Mass. 336, 340-41, 167 N.E.3d 822 (2021), the defendant argued that holding an evidentiary suppression hearing violated his due process rights under the Sixth and Fourteenth Amendments to the United States Constitution and under Massachusetts law. The *Vazquez Diaz* court ruled that the videoconferencing technology had adequate safeguards to protect those rights. The *Vazquez Diaz* court analyzed Zoom, the videoconferencing application used in that case, and found that it allowed the defendant to listen to the evidence, adequately observe the witnesses testifying at the hearing, and privately consult with his attorney at any time during proceedings. 487 Mass. at 342. The *Vazquez Diaz* court found no constitutional violation arose from using Zoom. 487 Mass. at 344.

Similarly in our case, the evidentiary hearing on the motion to terminate Mother's parental rights was also conducted through Zoom. We note also that before conducting the hearing, the district court satisfied itself that Mother had access to all exhibits, and that she could consult with her attorney privately through the videoconference software. The court also observed that an in-person hearing would have required the use of masks by all participants due to COVID-19 health safety practices. By contrast, the absence of masks as a benefit of videoconferencing allowed for better assessment of witness credibility.

Our review of the termination hearing transcript also reveals that the district court and counsel were not hesitant to ask other hearing participants, including witnesses, to speak up and repeat themselves if the audio quality rendered spoken comments unclear. Further, we observe that Mother's objections to having the hearing by videoconference are generic, i.e., she contends that the very fact of having the hearing held by videoconference is a per se due process violation. On appeal, she does not contend that the specific events of her hearing or the procedures used by the district court during this particular hearing resulted in a due process violation. For example, Mother does not complain that she did not have access to documents; that she lacked the ability to consult with her counsel as she wished; could not hear the testimony of witnesses; found the comments of the district court and counsel to be inaudible; or in any other way could not fully participate in the hearing.

Massachusetts is by no means the only jurisdiction that has contended with COVID-19, restrictions on courtroom proceedings, and the alternative of videoconference hearings. See *Matter of J.D.E.C.*, 491 P.3d 224, 229 (Wash. App. 2021) (holding that a termination of parental rights hearing conducted by Zoom did not violate due process). Other jurisdictions have reached the same conclusion as the *Vazquez Diaz* court in the opinions they have issued, although many are unpublished. *Gould Electronics Inc. v. Livingston County Road Commission*, 470 F. Supp. 3d 735, 742-44 (E.D. Mich.

15

2020) (holding that conducting a bench trial by videoconference did not violate due process rights); *Clarington v. State*, 314 So.3d 495, 509 (Fla. Dist. Ct. App. 2020) (holding that conducting a probation revocation hearing over Zoom did not violate due process); *In re Smith*, No. 355077, 2021 WL 2769825, at *4 (Mich. App. 2021) (unpublished opinion) (holding that conducting a termination of parental rights hearing over Zoom did not violate due process); *In re P.S.*, No. 5-21-0027, 2021 WL 3141203, at *14 (Ill. App. 2021) (unpublished opinion) (holding that conducting a termination of parental rights hearing over Zoom did not violate due process); *Xcoal Energy & Resources v. Bluestone Energy Sales Corp.*, No. 18-819-LPS, 2020 WL 4794533, at *2 (D. Del. 2020) (unpublished opinion) (holding that a remotely conducted bench trial did not violate due process); *Centripetal Networks, Inc. v. Cisco Systems, Inc.*, No. 2:18cv94, 2020 WL 3411385, at *1 (E.D. Va. 2020) (unpublished opinion) (denying a motion opposing holding a trial entirely by Zoom videoconferencing); *E.N. v. Texas Dep't of Family and Protective Services*, No. 03-21-00014-CV, 2021 WL 2460625, at *5 (Tex. App. 2021) (unpublished opinion) (holding that a termination of parental rights jury trial conducted by videoconference did not violate the father's due process rights).

In a case similar to ours, *Matter of J.D.E.C.*, the father argued that conducting a termination of parental rights trial by videoconference deprived him of due process. 491 P.3d at 226. The Washington Court of Appeals applied the three-prong test from *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The *Matter of J.D.E.C.* court balanced (1) the private interests affected, (2) the State's interest in using the challenged procedures, and (3) the risk of erroneous deprivation of the private interests due to the procedures used. The court noted that the father actively engaged in the trial, coordinated with his counsel through private breakout rooms, and had a meaningful opportunity to be heard. The *Matter of J.D.E.C.* court held that there was little risk of damage to the father's interest from the procedures used and strong interests for both the State and the children in holding a trial expeditiously without risking the spread of COVID-19. 491 P.3d at 228-29.

16

Here, the district court also applied the *Mathews* three-prong test. See *In re J.D.C.*, 284 Kan. 155, 166-67, 159 P.3d 974 (2007) (citing favorably to the *Mathews* test for weighing due process considerations). The court gave great weight to Mother's fundamental liberty interest in the care and control of her child. The court ruled that a termination of parental rights proceeding is "where that right is at its peak." But the court weighed this against the risk of erroneous deprivation of this interest through the procedures used and the probable value, if any, of additional or substitute safeguards. See *In re A.A.-F.*, 310 Kan. 125, 145, 444 P.3d 938 (2019). The court found "no risk" of deprivation of Mother's rights by proceeding through Zoom. The court examined the State's interest in the procedure used, including the fiscal and administrative burdens which would be incurred by using Zoom as a substitute procedure. The court found administrative and fiscal burdens to be low, but the interest in achieving permanency for C.T. to be high.

The district court also noted that, under Kansas Supreme Court directives, any in-person hearing would have required all participants to wear masks due to COVID-19 dangers. The district court found that masking would eliminate the ability of the court and the parties to observe the facial expressions of witnesses, which would impair the court's ability to assess witness credibility. Given the similarities between our case and *Matter of J.D.E.C.*, the reasoning from that court is highly persuasive. We conclude that the district court carefully and thoughtfully weighed the appropriate concerns about due process issues and insured that the proper safeguards for a fair and meaningful hearing were in place. Thus, the district court did not deprive Mother of due process by holding the termination of parental rights hearing through Zoom.

But Mother also argues that the district court violated her statutory right to an in-person hearing. "All trials on the merits must be conducted in open court and, subject to K.S.A. 20-347, and amendments thereto, in a regular courtroom." K.S.A. 2020 Supp. 60-104. "The chief judge in each judicial district, with the approval of the supreme court,

17

may provide for holding court in locations within such judicial district, other than in the courthouses of the several counties within such district, whenever suitable facilities are available for such purpose." K.S.A. 20-347. Mother contests, without citation, that video hearings are not in any one location and are thus not "suitable facilities" to hold court. Before the district court, Mother's counsel argued that, because Zoom was not suitable, the hearing could and should be held in the courtroom.

"MR. FISHER [Mother's attorney]:  Well, Judge, all I can say, I know there is other judicial districts that are having Court in the courtroom. As a matter of fact, I had hearings this morning with Judge Ward, who has scheduled hearings in the courtroom in November. I think Judge Johnson has had hearings in the courtroom in Linn County.

"So, I think, Judge, that yes, the Supreme Court rule indicates, you know, hearings by—that should be held remotely, but I would submit to the Court, Judge, that even in our own judicial district we are having—we are going to be scheduling Court in the courtroom unless something else happens.

"I mean, Judge Ward was very clear today we had hearings that were set in November that were going to be supposed—that right now are going to be in the courtroom unless something changes, if COVID-19 develops even worse or something.

"But I would submit to the Court, Your Honor, that if those cases were being held in Court and right now are being scheduled in Court, that that case could be scheduled in Court, Your Honor.

"THE COURT:  I'm sure you cannot imagine how vehemently I disagree with that specific position, all right."

"MR. FISHER:  I understand.

"THE COURT:  Moving on, moving on. So you also talked some in your motion about [K.S.A.] 60-104, which talks about that hearings need to be in person in the location, in the courtroom, but it looks to me like you're conceding part of that in paragraph seven when you talk about [K.S.A.] 20-347, giving the Chief Judge in the district who actually, as it turns out is me, not any of those other Judges you mentioned, the authority, with Supreme Court approval, to hold Court in locations other than the courthouse."

18

The district court and counsel both concluded that no Kansas case addresses whether K.S.A. 20-347's "suitable facilities" includes virtual spaces such as a Zoom videoconference.

Mother fails to connect K.S.A. 20-347 to her due process rights. The due process evaluation under *Mathews* concerns her constitutional right. But Mother's attempt to conjure a statutory right out of K.S.A. 20-347 fails for lack of citation. She does not explain how the authority of a judicial district's chief judge to choose an alternate location implicates her due process rights in a way that differs from her constitutional due process rights. She cites no authority that connects K.S.A. 20-347 to due process rights or any authority that gives a litigant standing to challenge the chief judge's choice of location. Mother provides no basis for analyzing her due process rights separately under K.S.A. 20-347.

In sum, for the same reasons that have persuaded numerous other jurisdictions, we hold that conducting hearings on motions to terminate parental rights in CINC cases by videoconference do not constitute a per se violation of due process rights, so long as adequate safeguards for the full, meaningful participation of all parties are determined by the district court to be present. These safeguards include adequate audio quality which allows all participants to hear the proceedings, the ability of participants to observe the witnesses, the ability of parties to access all exhibits, and the ability of parties to confer privately with their attorneys.

Affirmed.