NOT DESIGNATED FOR PUBLICATION

Nos. 129,521
129,522

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of R.O. and B.O.,
Minor Children.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; JOAN M. LOWDON, judge. Submitted without oral argument. Opinion filed May 1, 2026. Affirmed.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City, for appellant natural mother.

*Kirstyn Dvorak*, assistant county attorney, and *Todd Thompson*, county attorney, for appellee.

Before PICKERING, P.J., ISHERWOOD, J., and ANDREW M. STEIN, District Judge, assigned.

PER CURIAM: Mother appeals the termination of her parental rights to her twin daughters, claiming the district court erred in relying on the State's proffer in making its decision. After review, we find that the district court relied not only on the State's proffer, but also on evidence within its case file when it terminated Mother's parental rights. Thus, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2023, the Department for Children and Families (DCF) received a report that Mother dropped off B.O., an 11-year-old child, "'somewhere on Cherokee Street'" in Leavenworth to walk home at 11 p.m. B.O. was not wearing shoes. B.O. told police

officers that Mother told her to jump off Centennial Bridge. Mother told the police officers that she told B.O., "'You know how to swim.'"

Two days later, Cara Weaver, a DCF worker, went to B.O.'s middle school to conduct an interview, but B.O. was absent. Weaver went to the family home, where B.O. told Weaver that she was not in school because Mother wanted to spend the day with her. Mother was not awake, and B.O. could not wake her to talk with Weaver. Weaver interviewed B.O., who informed Weaver that Mother yelled at her, kicked her, and threw things at her and her twin sister, R.O.

The next day, DCF worker Tiffany Berneau Birkett interviewed R.O. R.O. informed Birkett that Mother usually punished B.O. worse than her and confirmed that Mother did take B.O. to the bridge and told her to "get out and go find her dad." R.O. said Mother "'throws pots and pans at [B.O.], hit her with a frying pan, and grabs [B.O.] by her hair and drags her out of the house by her hair a lot.'"

DCF worker Sandra Booker interviewed Mother. Mother told Booker that she drove B.O. to the Missouri River bridge and told her, "'[D]o you see that water? Hope you can swim. See this river? The way you're treating your sister, people come up missing or dead.'" Mother said that she did leave B.O. for a moment at the bridge but came back and brought her home. Mother did not want counseling or any services. She was not concerned with the children's behavior and said that "the girls are acting like 10-year-old girls do."

In May 2023, B.O. and R.O. ran away from home. DCF conducted further interviews of B.O. and R.O. at school, where the twins recounted Mother hitting them, throwing hard objects at them, and waking them up and "dump[ing] shampoo in [their] faces." The State filed petitions requesting that the girls be found to be children in need of care and that they be immediately removed from the home.

The district court ordered the girls' immediate removal from Mother's care and put in out-of-home placement because of: (1) Mother's "erratic, threatening behaviors toward [R.O.], [B.O.], DCF, and people at the children's school leading to her arrest"; (2) her pattern of abuse towards the children, including throwing objects at them; (3) Mother calling the children derogatory names; and (4) Mother dropping off [B.O.] "at the Centennial Bridge and left her, for a short time, telling her to swim to her dad in Arkansas." The following week, the court ordered that the children be placed in the temporary custody of the Secretary of DCF and authorized Mother's visitation with the girls "at the discretion of Cornerstones of Care."

In September 2023, the district court found by clear and convincing evidence that R.O. and B.O. were children in need of care based on K.S.A. 38-2202(d)(1)-(3): (1) The children were "without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the [children's] parents or other custodian"; (2) the children were "without the care or control necessary for the [children's] physical, mental or emotional health"; (3) R.O. "has been physically, mentally or emotionally abused or neglected, or sexually abused"; and (4) B.O. "has been mentally or emotionally abused or neglected, or sexually abused." The court continued placement of the children in the temporary custody of DCF, ordered Mother to undergo individual therapy, and reiterated that visitation was at the discretion of Cornerstones of Care.

Throughout the proceedings, Cornerstones of Care filed reports with the district court. The court admitted into evidence the reports filed on October 30, 2023; November 27, 2023; December 11, 2023; December 22, 2023; April 8, 2024; and August 30, 2024.

The State filed motions for findings of unfitness and termination of parental rights in July 2024. In the motions, the State alleged: (1) Mother failed to comply with the plan for reintegration; (2) Mother failed to provide income verification; (3) Mother failed to

3

engage in mental health services; (4) Mother completed a RADAC assessment; (5) Mother initiated parenting classes but was released "due to her erratic behaviors"; (6) Mother and the children could not start family therapy because Mother failed to comply with mental health services; and (7) issues stemming from visitation when Mother told the children to "'change what they said to DCF,'" Mother not leaving the office after visitation ended, and police escorting Mother out of Cornerstones of Care's office after a visit.

Dr. J. Stephen Hazel and Grace Hedberg, of Responsive Centers for Psychology & Learning, performed psychological and parenting examinations of Mother in April, September, and October 2024. Their report, issued in November 2024, diagnosed Mother with premenstrual dysphoric disorder, adjustment disorder with disturbance of conduct, parent-biological child relational problem, alcohol use disorder in early remission, and paranoid personality disorder. Regarding Mother's ability to parent B.O. and R.O., Responsive Centers found that a concern existed whether Mother could provide "a safe, appropriate, and stable home" and if she could "meet her daughters' needs, both physically and emotionally." Responsive Centers also noted:

> "[Mother's] paranoia may prevent her from thinking or communicating clearly with others. She may make decisions that affect herself and her daughters that are unwise. Her behavior can be erratic and unpredictable. She has little to no insight into her mental health issues and its effects."

The State had problems serving Father, and Mother's attorney became ill, so several continuances were filed before a termination hearing was held in December 2024. Mother failed to appear at the termination hearing despite several attempts to contact her. Mother's counsel had the impression that she was going to appear. Mother's godmother told the court that Mother was coming to the hearing but could not provide a timeline. The district court took several recesses to provide Mother with the opportunity to appear,

but, because Mother could not provide a timeline and did not appear, the district court proceeded with the hearing.

The State proffered:

"[T]he petition and affidavit that were filed in the case on the 24th day of May, 2023, as well as any and all of the Cornerstones of Care court reports, as well as the Cornerstones of Care reintegration plan, as well as the termination motion that was filed in this case on the 8th day of July, 2024."

The district court clarified whether the State's proffer included "the most recent court report of December 18th, 2024, which [it] believe[ed] ha[d] an attachment regarding the evaluation done by . . . Clinical Associates." And the State said, "Yes, Your Honor, that is correct."

Mother did not instruct her counsel to object to the State's proffer. The district court adopted its findings of fact from the State's "initial affidavit and petition, . . . any and all agency court reports" filed throughout the case, and the information from the State's motions for finding of unfitness and termination of parental rights. The district court admitted into evidence "all agency court reports that have been filed throughout the duration of the case" including "the most recent court report of December 18th, 2024."

The district court found by clear and convincing evidence, which included the Responsive Centers' psychological evaluations of Mother, that Mother was unfit under K.S.A. 38-2269(b)(1), (b)(2), (b)(4), (b)(7), (b)(8), (c)(2), and (c)(3), and that Mother's unfitness was "unlikely to change in the foreseeable future." The court also found that termination of Mother's parental rights was in the best interests of the children because

"it has been a very long time since the children have seen either parent, the age of the case, the age of the children, Mother's instability, Father's complete lack of involvement, and that these children do deserve permanency at some point in their life.

. . . .

"The Court will also note that there have been a number of times where therapy and therapeutic interventions have been attempted; that Mother has, quite frankly, stalled the process or caused a disruption of those services. I think the most recent report, again, of December 18th, 2024, gives a very extensive factual basis for the Court to rely on as it relates to all elements of this case but also to include the best interest of the children."

In making its best interests finding, the district court found that the "physical, mental, or emotional needs of the [children] would best be served by termination of parental rights." The district court filed the journal entry terminating Mother's and Father's parental rights on January 17, 2025. Mother appealed. Father is not a party to this appeal.

ANALYSIS

*Preservation*

Mother does not challenge the district court's finding that termination of her parental rights was in the best interests of the children. That issue is thus waived. See *In re Adoption of Baby Girl G.*, 311 Kan. 798, 803, 466 P.3d 1207 (2020) (issue not briefed deemed waived or abandoned).

On appeal, Mother argues that the district court did not rely on clear and convincing evidence to terminate her parental rights when it relied on the State's proffer. Mother acknowledges that she did not raise the issue before the district court but invokes

6

the fundamental liberty interest as a prudential exception. She cites to *In re A.S.*, 319 Kan. 396, 402, 555 P.3d 732 (2024), for the proposition that she is not required "to explain the issue was preserved, but rather why an unpreserved issue should be considered."

The State argues that we should not reach the merits of Mother's argument because she raises the issue for the first time on appeal. Because Mother only asserts a fundamental liberty interest but cites no legal authority for her proposition, the State urges us to exercise our discretion and decline to reach the merits.

> "Ordinarily, appellate courts do not consider constitutional issues raised for the first time on appeal. But the courts can opt to review newly raised issues where:
>
> "'(1) the newly asserted theory involves only a question of law arising on proved or admitted facts . . . ; (2) consideration of the theory is necessary to serve the ends of justice or to prevent [a] denial of fundamental rights"; or (3) the district court's judgment is correct for the wrong reason.
>
> "Because these exceptions are 'prudential,' an appellate court has discretion over the decision of whether to extend one. [Citations omitted.]" 319 Kan. at 399.

Mother raises the exception that "a parent's right to make decisions regarding the care, custody, and control of his or her child qualifies as a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution." *In re Adoption of B.J.M.*, 42 Kan. App. 2d 77, 81, 209 P.3d 200 (2009). Therefore, we will reach the merits of the issue.

*Standard of Review*

"Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *In re Adoption of Baby Girl G.*, 311 Kan. at 806.

*The District Court Did Not Err When It Relied on the State's Proffer and the Case Reports*

Mother cites to *In re A.K.*, 320 Kan. 805, 572 P.3d 763 (2025), to support her argument that the district court committed legal error when it found Mother unfit based solely on the State's proffer.

The State contends that the district court relied on clear and convincing evidence—the Cornerstones of Care court reports admitted into evidence—when it granted the State's motions for finding of unfitness and termination of parental rights.

In *In re A.K.*, a mother seldomly appeared during the child in need of care and termination of parental rights proceedings. At the termination hearing, the mother's substitute counsel told the court that mother was hospitalized with congestive heart failure and asked for a continuance. The district court found that mother did not show good cause to continue and proceeded by proffer. The mother's substitute counsel was not instructed to object. The State proffered that the mother had a long history of chronic drug use and failed to complete case plan tasks. The district court terminated the mother's parental rights.

The mother appealed, and another panel of our court "rejected her claims and affirmed [the termination of her parental rights]. *In re A.K.*, No. 127,259, 2024 WL 4248420 (Kan. App. 2024) (unpublished opinion)." *In re A.K.*, 320 Kan. at 808. Our Supreme Court accepted the mother's petition for review.

On appeal, our Supreme Court interpreted K.S.A. 38-2248(f), which states: "In evidentiary hearings for termination of parental rights . . . , the case may proceed by proffer as to parties not present, unless they appear by counsel and have instructed counsel to object."

The *In re A.K.* court defined "[a] proffer for purposes of K.S.A. 38-2248(f) [as] a statement or submission describing the substance of evidence." 320 Kan. 805, Syl. ¶ 3. The Supreme Court defined evidence as:

> "the means from which inferences may be drawn as a basis of proof and includes testimony in the form of opinion, and hearsay. Evidence is given under oath, subject to cross-examination, limited to things within a witness' personal knowledge, experience, and education or training, and must be authentic and relevant. These features give evidence a measure of reliability, so that it tends to prove a material fact." 320 Kan. 805, Syl. ¶ 4.

The Supreme Court interpreted K.S.A. 38-2269(a) and K.S.A. 38-2248(f) together to mean that the State may proffer some of its evidence, but the district court must rely on clear and convincing evidence to terminate parental rights. "A proffer, as a matter of law, is not evidence." 320 Kan. at 814-15. The *In re A.K.* court found that a proffer does not have any "indicia of reliability" and the district court erred when it relied on the *proffer alone* to find the mother unfit and terminated her parental rights. 320 Kan. at 815.

As in *In re A.K.*, here, Mother was not present at the proceedings, she did not instruct her attorney to object to the proffer, and the district court relied on the State's proffer when it terminated Mother's parental rights. But unlike *In re A.K.*, the court here also relied

> "on all of the facts that have been presented throughout this case . . . . The most recent report I think gave—kind of a good synopsis for where we are right now, but my factual findings include facts in other affidavits and agency reports that have been filed throughout the duration of this case."

In *In re A.K.*, the State proffered that "Mother totally failed to complete case plan tasks aimed at reintegration, like securing stable housing, undergoing mental health assessments, maintaining contact with caseworkers, and submitting to scheduled drug screenings . . . ." 320 Kan. at 808. In contrast, here, the State did more than "demonstrate[] 'the substance' of the evidence sought to be introduced"; the State directed the district court to documents that could be used to draw inferences as a basis of proof. See *In re A.K.*, 320 Kan. at 814.

The district court accepted into evidence the documents the State proffered. Those documents included:

> "the State's petition and affidavit along with all agency court reports that have been filed throughout the duration of the case, to include the most recent court report of December 18th, 2024. [The] State has also moved to admit and the Court has received into evidence the motion for finding of unfitness and termination of parental rights."

Mother did not object to the district court's findings of fact or admission of the State's evidence. The State did more than describe what its evidence would be if it presented it; the State presented documents for the court's review that acted as the basis of proof.

10

The State's petitions and motions for unfitness and termination of parental rights suggest what the State would prove. But the case reports are evidence used to prove the State's petitions and motions. "Kansas courts have long held that a court may judicially notice its own case files under K.S.A. 60-409(b)(4) as a specific and easily verifiable fact from a source with indisputable accuracy." *Hernandez v. Pistotnik*, No. 126,255, 2024 WL 3874096, at *9 (Kan. App.) (unpublished opinion), *rev. denied* 319 Kan. 833 (2024).

In a child in need of care case, a district court "may take judicial notice of its own court file . . . containing all the pleadings filed in district court and the social file containing reports and evaluations of the parties involved in the case." *In re K.H.*, 56 Kan. App. 2d 1135, 1141, 444 P.3d 354 (2019). Under K.S.A. 38-2219(e)(2):

> "All reports provided for in this section may be read by the court at any stage of a proceeding under this code, but no fact or conclusion derived from a report shall be used as the basis for an order of the court unless the information has been admitted into evidence following an opportunity for any party or interested party to examine, under oath, the person who prepared the report. If the court is in possession of a report that has not been offered into evidence, the court shall inquire whether there is an objection to admitting the report into evidence. If there is no objection, the court may admit the report into evidence."

Mother did not object to the admission of the case reports into evidence. More specifically, Mother did not object to admission of Responsive Centers' psychological assessment, which the State offered to the district court and the district court admitted into evidence. And throughout the proceedings, the district court admitted into evidence the Cornerstones of Care reports. The district court relied on the social file as evidence when it terminated Mother's parental rights.

11

The district court specified that it had reviewed the case file, and it stated the specific report it relied on—the psychological evaluation from Responsive Centers. These documents supported the district court's decision to terminate Mother's parental rights. The district court did not err when it relied on the State's proffer and the case reports filed in this case. The district court relied on clear and convincing evidence when it terminated Mother's parental rights.

Affirmed.